


FILED

Mar 27 2019, 12:28 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-CR-604

## Jeffrey Fairbanks,

*Appellant (Defendant)*

–v–

## State of Indiana,

*Appellee (Plaintiff)*

---

Argued: December 6, 2018 | Decided: March 27, 2019

Appeal from the Marion Superior Court,
No. 49G03-1508-MR-30525
The Honorable Sheila A. Carlisle, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 49A02-1707-CR-1675

---

**Opinion by Chief Justice Rush**

Justices David, Massa, Slaughter, and Goff concur.

**Rush, Chief Justice.**

In criminal cases, Indiana Evidence Rule 404(b)'s purpose is to prevent the jury from indulging in the "forbidden inference"—that a defendant must be guilty of the charged crime because, on other occasions, he acted badly. To achieve this purpose, Rule 404(b) prohibits the State from introducing evidence of other bad acts to show a defendant's propensity to commit a crime. But the Rule permits this evidence for other purposes, including to show "lack of accident."

Here, to prove that the death of Jeffrey Fairbanks's infant daughter was not an accident, the State introduced evidence at Fairbanks's trial that he had, on prior occasions, used a pillow to muffle the baby's crying. We hold that admitting this evidence was not improper under Rule 404(b) because the State had "reliable assurance"—in statements Fairbanks made before trial to police and to news outlets—that he would raise an accident defense at trial.

And since the evidence's prejudicial impact did not substantially outweigh its probative value, the trial court did not abuse its discretion in admitting the evidence. We therefore affirm Fairbanks's conviction for felony neglect of a dependent resulting in death.

## Facts and Procedural History

On the morning of May 28, 2015, three-month-old Janna was asleep in a king-size bed with her father, Jeffrey Fairbanks. Janna's mother had left for work, leaving the infant in Fairbanks's care. At the time, Janna's half-sisters were home, too.

One of the half-sisters, A.G., heard Janna crying three separate times. The first time, A.G. heard Janna cry "like a regular baby would cry." The next two times, though, A.G. thought the cries "sounded muffled."

At some point in the day, Janna died, and Fairbanks left the house with his daughter's body wrapped in a blanket. He returned, alone, late that night.

Janna's mother and half-sisters immediately asked about the infant's whereabouts. Fairbanks said that Janna was dead and that he had buried her in a cornfield. He never told them how the baby died.

The next day, police questioned Fairbanks, and he told officers that he put Janna's body in a dumpster. Fairbanks admitted that, during an early morning diaper change, he had placed a pillow over the baby to "muffle her"—but that he took the pillow off "right away" and that they both eventually went back to sleep. He claimed that he later woke up, realized Janna was "already gone," and panicked. Fairbanks stated that it didn't look like he had "rolled over on" the infant, but it was "the only thing [he] could think of" when trying to figure out what happened.

Officers searched extensively for Janna. They never found her body, but they did find the blanket that she had been wrapped in.

Two media outlets then interviewed Fairbanks. In these interviews, Fairbanks again admitted that he had taken his daughter's body to a dumpster. He claimed that he had woken up in the afternoon to find the baby limp and lifeless and that he didn't know why. In response to some questions, Fairbanks said he didn't know much about "roll-over deaths" but that he didn't think he had rolled onto Janna.

The State charged Fairbanks with murder and felony neglect of a dependent resulting in death. Before trial, both the State and the defense brought up the admissibility of certain evidence—including testimony that, on previous occasions, Fairbanks had placed a pillow over Janna. The State asserted, in its notice of intent to use 404(b) evidence, that the pillow evidence was admissible; but Fairbanks, in his motion in limine, argued it was not.

During a hearing on the matter, the State argued, in part, that it needed the pillow evidence to show that Janna's death wasn't an accident, making the testimony admissible under Indiana Evidence Rule 404(b). In response, the defense contended that the pillow evidence was both unreliable and highly prejudicial—but never stated that Fairbanks wasn't going to raise an accident defense. Ultimately, the trial court agreed with

the State's position and denied Fairbanks's request to exclude the evidence.

At trial, half-sisters A.G. and E.M. testified about the prior pillow incidents. A.G. testified that she had seen Fairbanks put a pillow on Janna's face "[t]wo or three times" and that Fairbanks had said the pillow would stop Janna's cries, relax her, and put her to sleep. A.G. also testified that the crying she had heard on these prior pillow occasions was the same as the muffled crying she heard on the day of Janna's death.

E.M. then testified that she had twice seen a pillow over Janna's face when Fairbanks was taking care of the baby. One of the times, E.M. asked Fairbanks why Janna had a pillow on her face, and Fairbanks responded that the infant, who was around two months old at the time, had maybe placed it there herself.

Also among the testifying witnesses was a pediatrician who had previously examined Janna and who had reviewed the baby's medical records. She testified extensively about Janna's health and noted, among other things, that Janna was a "fine, healthy weight" at her ten-day check-up. Defense counsel questioned the pediatrician about co-sleeping, and she stated, "We recommend babies sleep in their own bed and not with the parents for the concern that someone could roll on the baby, or they could accidentally get smothered against someone at night."

Then, toward the end of trial, the court admitted the two news interviews, and the jury watched both.

During closing argument, the State asserted that Fairbanks was guilty of murder because he "smothered Janna with a pillow," knowingly causing her to die. The State further argued that Fairbanks was guilty of the neglect charge because he placed his dependent child "in a situation that endangered her life" when he "plac[ed] a pillow over her head" and then "went back to sleep."

The defense maintained that the State hadn't proven the charges beyond a reasonable doubt, in part because the State did not show how Janna died. To that end, defense counsel argued, "People sleep with their

kids all the time. This is accidental. It's an accident compounded by his stupidity of what he did with his own daughter . . . ."

The jury acquitted Fairbanks of the murder charge but found him guilty of felony neglect of a dependent resulting in death. The trial court sentenced him to thirty years.

Fairbanks appealed, raising a number of arguments—including that the evidence of prior pillow incidents was inadmissible under Indiana Evidence Rule 404(b). The Court of Appeals unanimously rejected Fairbanks's arguments and affirmed the conviction. *Fairbanks v. State*, 108 N.E.3d 357, 374 (Ind. Ct. App. 2018); *id.* at 374–76 (Pyle, J., concurring).

Fairbanks petitioned for transfer, which we granted, vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).

## Standard of Review

Here, two standards of review apply to the trial court's ruling on the admission of evidence. First, this evidentiary ruling turned on a purely legal, threshold question—whether a defendant must first affirmatively assert an accident defense before the 404(b) lack-of-accident exception becomes available. We thus review that aspect of the ruling de novo. *See Hirsch v. State*, 697 N.E.2d 37, 40 (Ind. 1998). But to the degree the evidentiary ruling did not raise a question of law, we review for an abuse of discretion. *See Inman v. State*, 4 N.E.3d 190, 197 (Ind. 2014). Under that standard, we reverse only when the admission is clearly against the logic and effect of the facts and circumstances. *Shinnock v. State*, 76 N.E.3d 841, 842–43 (Ind. 2017).

## Discussion and Decision

Indiana Evidence Rule 404(b) serves to safeguard the presumption of innocence in favor of criminal defendants. *See Swain v. State*, 647 N.E.2d 23, 24 (Ind. Ct. App. 1995) (quoting *Hardin v. State*, 611 N.E.2d 123, 128 (Ind. 1993)), *trans. denied*. The Rule's mandate is clear: a court may not admit evidence of another crime, wrong, or act "to prove a person's

character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). This restriction prevents the jury from indulging in the "forbidden inference" that a criminal defendant's "prior wrongful conduct suggests present guilt." *Byers v. State*, 709 N.E.2d 1024, 1026–27 (Ind. 1999).

But Rule 404(b) does not totally proscribe other-bad-acts evidence—only its use as character evidence. Indeed, the Rule plainly states that other-bad-acts evidence may be admissible for other purposes, and it provides an illustrative list—to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). So when the State claims that other-bad-acts evidence is admissible for a proper purpose, the trial court is tasked with deciding whether that evidence "is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Hicks v. State*, 690 N.E.2d 215, 219 (Ind. 1997).

If the evidence passes that relevance test, it has to clear a second hurdle: Indiana Evidence Rule 403's balancing test. In applying Rule 403, the trial court must conclude that the evidence's probative value is not "substantially outweighed" by the danger of unfair prejudice, Evid. R. 403—otherwise, the evidence is not admissible. *See Hicks*, 690 N.E.2d at 223.

While the general principles underlying the admissibility of other-bad-acts evidence have been recited numerous times, *see, e.g.*, *id.* at 221, Rule 404(b) continues to prove difficult in application. We have recognized as much, stating that the use of other-bad-acts evidence "to prove matters other than general character has always been problematic for the courts." *Wickizer v. State*, 626 N.E.2d 795, 797 (Ind. 1993) (quoting Gregory P. Joseph & Stephen A. Saltzburg, Evidence in America: The Federal Rules in the States § 14.3, at 6 (Supp. 1992)).

This case was no exception, as it brought to light an unsettled question regarding one of Rule 404(b)'s listed permissible purposes—lack of accident. Specifically, does a criminal defendant have to affirmatively raise an accident defense before the State may introduce other-bad-acts evidence to show the charged conduct was not an accident? The Court of

Appeals panel aptly noted that there is "no clear-cut answer under Indiana law" to this question. *Fairbanks*, 108 N.E.3d at 367–68.

After examining our precedent addressing other Rule 404(b) exceptions—intent, plan, and motive—we hold that lack-of-accident evidence may be admitted only (1) when the State has "reliable assurance" that an accident defense will be raised or (2) after the defendant places accident at issue at trial.[1]

Here, Fairbanks did not place accident at issue at trial before the State introduced the lack-of-accident evidence—the prior pillow incidents. But his statements before trial to police and to the news media gave the State "reliable assurance" that he would raise an accident defense. The accident exception was thus available to the State when it offered the 404(b) evidence in question. And because that pillow evidence's probative value was not substantially outweighed by its prejudicial effect under Rule 403, the trial court did not abuse its discretion in admitting the evidence. We thus affirm Fairbanks's conviction for felony neglect of a dependent resulting in death.

## I. Indiana cases addressing other Rule 404(b) exceptions provide valuable guidance.

The parties' arguments regarding the admissibility of pillow evidence boil down to a matter of chronology. While the State contends that its introduction of Rule 404(b) lack-of-accident evidence does not require the defendant to first assert accident as a defense at trial, Fairbanks maintains the opposite—that a criminal defendant must raise an accident defense at trial before lack-of-accident evidence may be admitted. Both parties claim that this Court's prior cases addressing other Rule 404(b) exceptions support their respective positions—so we examine those cases closely.

---

[1] On all other issues, we summarily affirm the decision of the Court of Appeals. *See* App. R. 58(A)(2).

In *Wickizer v. State*, this Court addressed a similar chronology argument that implicated the intent exception of Rule 404(b). 626 N.E.2d 795 (Ind. 1993). In that case, we first noted that a defendant's mental state or culpability is an element to be proven in the vast majority of criminal cases; so, evidence of intent is typically considered both relevant and probative. *Id.* at 797. But we acknowledged the dangers in construing the intent exception too broadly. *Id.*

We specifically recognized that to allow other-bad-acts evidence to prove intent when a defendant merely denies involvement in a crime would often produce the "forbidden inference"—a result at odds with Rule 404(b)'s overarching purpose. *Id.* at 797, 799. So, we held that Rule 404(b)'s intent exception is available only "when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent." *Id.* at 799. In other words, to use the Rule 404(b) intent exception, the State needed more than a "mere denial of involvement in the offense"; it needed to be confronted with a defendant's claim that "whatever conduct he may have engaged in, he did not possess the necessary *mens rea* for the offense." Jeffrey O. Cooper, *The Continuing Complexity of Indiana Rule of Evidence 404(b)*, 35 Ind. L. Rev. 1415, 1420 (2002).

This Court in *Wickizer* then addressed the timing of a defendant's claim of particular contrary intent, providing several examples of when the Rule 404(b) intent exception becomes available to the State. 626 N.E.2d at 799. We first explained that the exception becomes available when a defendant's claim of contrary intent is alleged in the "opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief." *Id.*; *see also Lafayette v. State*, 917 N.E.2d 660, 663 (Ind. 2009). But we also explained that, under the facts of that particular case, the State's timing in using the Rule 404(b) intent exception was faulty **not only** because the defendant failed to first raise contrary intent at trial—**but also** because the State, when offering the 404(b) intent evidence, had no "reliable assurance" that the defendant would affirmatively contest the issue of intent. *Wickizer*, 626 N.E.2d at 800.

Questions then began to arise about the effect of *Wickizer*'s holding on other Rule 404(b) exceptions.

First, in *Goodner v. State*, this Court dealt, in part, with the admissibility of other-bad-acts evidence to prove "plan." 685 N.E.2d 1058 (Ind. 1997). We stated that "[t]he concerns that led us in *Wickizer* to adopt a narrow construction of the intent exception do not appear applicable to evidence of acts that are part of the 'plan' for the charged offense." *Id.* at 1061. We explained that our concern in *Wickizer* was that a broad interpretation of the intent exception could defeat the overarching purpose of Rule 404(b) because "mental state is an element to be proven by the prosecution in 'virtually every criminal case.'" *Id.* at 1061 n.3 (quoting *Wickizer*, 626 N.E.2d at 797). In declining to extend a *Wickizer*-like approach to the plan exception, we noted that "[o]ther exceptions under 404(b) necessarily involve a different set of issues" than intent. *Id.*

Shortly after, in *Hicks v. State*, this Court addressed the impact of *Wickizer* on Rule 404(b)'s "motive" exception. 690 N.E.2d 215 (Ind. 1997). We again noted that *Wickizer* construed the intent exception narrowly because of the intent exception's unique nature and the associated likelihood of creating the "forbidden inference." *Id.* at 222 n.12. We then compared intent to motive, noting that "[m]otive and most other collateral issues are unlike intent"—reasoning that 404(b) motive evidence is "less likely than intent to be relevant as a general matter" and therefore less likely to produce the "forbidden inference." *Id.* So, we concluded that *Wickizer* did not apply to the motive exception. *Id.*

Thus, *Goodner* and *Hicks* plainly refused to extend *Wickizer* to Rule 404(b)'s plan and motive exceptions. But what does that mean for Rule 404(b)'s lack-of-accident exception? We address that question below, focusing on the relationship between "lack of accident" and "intent," along with the reasons underlying *Wickizer*'s narrow construction of the intent exception.

## II. Because "lack of accident" is a subset of intent, *Wickizer*'s holding also applies to that Rule 404(b) exception.

In *Goodner* and *Hicks*, we explained that *Wickizer* did not necessarily apply to every Rule 404(b) exception. But neither case explicitly foreclosed the possibility that *Wickizer* could extend to another Rule 404(b) exception—if that exception proved sufficiently similar to the intent exception. After all, this Court was careful in *Hicks* to note that "[m]otive and **most** other collateral issues are unlike intent," 690 N.E.2d at 222 n.12 (emphasis added)—implicitly recognizing there may be an exception that **is** like intent.

And the lack-of-accident exception is just that—like intent. In fact, jurists have described the lack-of-accident exception as a "more specialized application of the broader category of 'intent.'" 22B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5255 (2017); *see also* 12 Robert Lowell Miller, Jr., Indiana Practice, Indiana Evidence § 404.229 (4th ed. 2016) (stating that lack of accident "has been said to be 'simply a special form of the exception that permits the use of other crimes to prove intent'").

That description is apt. After all, when the State seeks to introduce other-bad-acts evidence to disprove accident, the State wants to show the defendant had the requisite *mens rea* to commit the charged act. Or conversely, a criminal defendant claiming an act was accidental is necessarily claiming a lack of the requisite criminal intent.

The State acknowledges the inextricable link between "lack of accident" and "intent," arguing that the other-bad-acts evidence offered in this case was relevant to show that the victim's "death was not simply accidental . . . but was intentional, knowing, or negligent." The State's position demonstrates that "lack of accident" is generally relevant at a criminal trial because a defendant's mental state will usually be an element to be proven.

This brings us back to *Wickizer* and its reasons for construing Rule 404(b)'s intent exception narrowly. Our holding in *Wickizer* was premised on intent virtually always being at issue in a criminal trial, thus making Rule 404(b) intent evidence practically always relevant. 626 N.E.2d at 797. And we recognized the danger in using other-bad-acts evidence generally to show intent: creating the "forbidden inference" that a criminal defendant has a criminal propensity and acted in accordance with that character by engaging in the charged conduct. *See id.* at 799.

The same danger exists with the lack-of-accident exception. "Lack of accident" is usually relevant in any criminal matter, since a defendant's *mens rea* is almost always at issue. And this general relevancy greatly increases the risk of creating the "forbidden inference" Rule 404(b) aims to prohibit. *See Hicks*, 690 N.E.2d at 222 n.12.

For that reason, the *Wickizer* approach applies to Rule 404(b)'s lack-of-accident exception. This means that before the State may offer other-bad-acts evidence of lack of accident, one of two things must have occurred: (1) the State had "reliable assurance" that an accident defense would be raised, or (2) the defendant placed accident at issue at trial.[2]

---

[2] Caselaw interpreting Federal Rule of Evidence 404(b)'s lack-of-accident exception reflects a similar approach. Specifically, federal courts have sanctioned the use of 404(b) other-bad-acts evidence to prove lack of accident only after an accident defense has been, or is likely to be, asserted. *See, e.g., United States v. Bell*, 516 F.3d 432, 442 (6th Cir. 2008) (explaining that for other-bad-acts evidence to be admissible to show lack of accident, the government must be seeking "to prove a fact that the defendant has placed, or conceivably will place, in issue" (quoting *United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996))); *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1046 (10th Cir. 2005) (finding lack-of-accident evidence inadmissible in a suit alleging excessive force by a police officer when there was no suggestion that the police officer accidentally used the police dog); *see also* Wright & Graham, *supra*, at § 5255 (stating that use of the lack-of-accident exception should be confined to cases in which "accident seems a plausible defense"). Although we aren't bound by these interpretations of Federal Rule of Evidence 404(b), we are willing "to look to federal cases interpreting the rules for guidance when we are confronted with a similar issue." *Lewis v. State*, 34 N.E.3d 240, 248 n.6 (Ind. 2015) (quoting *Dowdy v. State,* 672 N.E.2d 948, 951 (Ind. Ct. App. 1996), *trans. denied*).

With that chronology in mind, we now determine whether the trial court abused its discretion in admitting the Rule 404(b) other-bad-acts evidence to prove lack of accident.

## III. The trial court did not abuse its discretion in admitting the lack-of-accident evidence.

Here, the State introduced testimony that Fairbanks at least twice placed a pillow over Janna's face. This other-bad-acts evidence was offered to show that Janna's death was not an accident but that Fairbanks purposefully placed a pillow on Janna and caused her death intentionally, knowingly, or negligently. This testimony was admitted fairly early during trial, and the record does not reveal any prior time at trial when Fairbanks raised the issue of accident.

The State did, however, have "reliable assurance" that Fairbanks would raise an accident defense, derived from his pretrial statements to police and from his news interviews before trial. Fairbanks claimed to police that although it did not look like he had rolled onto his infant daughter, it was the "only" thing he could think of. And Fairbanks explained to two media outlets that he didn't know much about "roll-over deaths." Given those statements, the State had every reason to suspect that Fairbanks would advance a theory that Janna's death was accidental.

And, in fact, Fairbanks did raise the issue of accident—albeit after the Rule 404(b) pillow evidence was introduced. Defense counsel cross-examined Janna's pediatrician about the dangers of co-sleeping, which brought up the issue of roll-over deaths. And, later, during closing argument, defense counsel explicitly stated that Janna's death was an accident: "Was it unsafe? People sleep with their kids all the time. This is accidental. It's an accident . . . ."

Given the State's "reliable assurance" of a forthcoming accident defense, the trial court did not abuse its discretion in finding that the pillow evidence was "relevant to a matter at issue other than [Fairbanks's] propensity to commit the charged act." *Hicks*, 690 N.E.2d at 219. But our review does not end there—we must still determine whether the trial

court properly found that the pillow evidence cleared Rule 403's balancing test.

There, again, the trial court did not abuse its discretion—the prejudicial impact of the pillow evidence did not substantially outweigh its probative value. First, Fairbanks himself admitted in his first statement to police that he placed a pillow on Janna to muffle her crying on the day she died. And, second, while the other-bad-acts evidence showed that Fairbanks had placed a pillow over Janna's face to stop her crying several times previously, none of it showed that any physical harm had resulted. Although the pillow evidence certainly painted Fairbanks in a bad light, its prejudicial impact was significantly trumped by the evidence's highly probative value to show that Janna's death was not accidental—especially considering her body was never recovered.

We thus conclude that the admission of the Rule 404(b) lack-of-accident evidence was not an abuse of discretion.

## Conclusion

Today, we hold that the State may introduce other-bad-acts evidence to show lack of accident only (1) when the State has "reliable assurance" that an accident defense will be raised, or (2) after the defendant places accident at issue at trial. Here, the State was reliably assured that Fairbanks would raise an accident defense; therefore, it could properly introduce the Rule 404(b) evidence. And because that evidence's prejudicial effect did not outweigh its probative value, there was no abuse of discretion in admitting it. We thus affirm Fairbanks's conviction for felony neglect of a dependent resulting in death.

David, Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
G. Allen Lidy
Lidy Law, PC
Mooresville, Indiana

Robert E. Saint
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

John V. Siskopoulos
Siskopoulos Law Firm, LLP
Boston, Massachusetts

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Tyler G. Banks
Deputy Attorneys General
Indianapolis, Indiana