# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 31 2019, 10:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Jason Gray, Certified Legal Intern
Riley L. Parr, Certified Legal Intern
Appellate Clinic
Indiana University
Robert H. McKinney School of Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joshua Adam Anderson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | July 31, 2019 <br><br> Court of Appeals Case No. 18A-CR-2599 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa F. Borges, Judge <br><br> Trial Court Cause No. 49G04-1611-MR-44184 |

**Crone, Judge.**

# Case Summary

Joshua Adam Anderson appeals his conviction for murder, a felony. He contends that the trial court abused its discretion by admitting certain evidence and committed fundamental error by inadvertently failing to collect an exhibit that was passed out to the jury and failing to give a reasonable theory of innocence instruction. He also asserts that the sentencing order incorrectly indicates that two counts with which he was charged were dismissed when the jury actually found him not guilty of those counts. Finding that the trial court's failure to collect the exhibit did not result in fundamental error and further finding that the trial court committed no error in admitting evidence or instructing the jury, we affirm his conviction.[1] However, because the sentencing order does not correctly reflect that the jury found Anderson not guilty of two counts with which he was charged, we remand for correction of the sentencing order.

# Facts and Procedural History

All relevant events occurred in 2016. In September of that year, Anderson met Sam Huggins. They developed an intimate relationship, and Anderson moved into Huggins's Indianapolis apartment. On the night of either November 4 or 5, Anderson introduced his friend, Edward Parr, to Huggins. Huggins picked

---

[1] Anderson also asserts that the cumulative effect of the trial court's errors resulted in fundamental error requiring reversal of his conviction. Given our resolution of his individual claims of error, we need not address his claim of cumulative error.

up Anderson and Parr in his silver 2000 Jeep Cherokee and drove them to his apartment where the three drank alcohol. Parr was surprised when he saw Huggins and Anderson kissing because he was unaware that Anderson was homosexual. At some point, Huggins asked Parr to leave, and Parr walked home.

[3] The next day, Anderson called Parr, and they met near an Indianapolis library. They talked "about what happened inside [Huggins's] apartment" the night before, and Anderson told Parr, "[S]ometimes you got to do what you got to do to get what you want." Tr. Vol. 2 at 103-04.

[4] On November 6 at about 5:00 a.m., Anderson called Parr and asked him if he wanted to "get high." *Id*. at 104. Parr agreed, and Anderson picked up Parr in Huggins's Jeep. Anderson explained to Parr that Huggins had left town to visit his sister in Florida and that Huggins had left Anderson the Jeep, some money, a credit card, and a debit card, and told Anderson to have fun. Over the course of the next few days, Anderson used Huggins's credit and debit cards to obtain money to buy crack cocaine. In fact, Huggins's bank and credit records revealed that between November 7 and 10, more than $1500 had been withdrawn or spent from Huggins's two bank accounts and one credit card account. When Anderson ran out of money, he returned to Huggins's apartment and took two television sets, an Xbox, and some DVDs to trade for drugs.

Anderson and Parr did drugs in a hotel room for a day and a half and then went to various friends' homes, where they continued to use drugs. Sometimes Anderson left Parr and drove the Jeep somewhere else to buy more drugs. After one of these trips, Anderson returned to Parr's location without the Jeep but as a passenger in someone else's vehicle. On the night of November 7, Anderson and Parr walked to Parr's home. As they walked, Anderson started crying and told Parr that he "choked the life out of [Huggins] and threw him in the bathtub." *Id*. at 109. Parr was not sure whether to believe Anderson.

On the morning of November 8, Parr sent an anonymous email tip to the police through Crime Stoppers. The following day, Parr called the Indianapolis Metropolitan Police Department and spoke to Detective Robert Flack. After confirming some of the information relayed by Parr, Detective Flack went to Huggins's apartment. A maintenance worker opened the door to the apartment to allow the detective to enter. Detective Flack saw no signs of forced entry. He announced his presence multiple times and called out for Huggins but received no response. He walked through the apartment and entered the bedroom, where he observed an unmade bed, a single slipper on the floor next to the bed, and an empty space where he believed a television had been. He saw no signs of a struggle. As Detective Flack approached the bathroom, he detected "a fragrance-type odor." *Id*. at 29. He entered the bathroom, pulled back the shower curtain, and found Huggins's dead body in the bathtub. The bathtub was filled with water, in which opened bottles of cologne and mouthwash were floating. Huggins was wearing his underwear, his shirt was

pulled up partway over his head, and he had on one slipper that paired with the one Detective Flack had seen by the bed.

[7] A forensic pathologist performed an autopsy and determined that Huggins's cause of death was asphyxia due to strangulation and drowning. *Id.* at 188. The pathologist also observed numerous injuries to Huggins's head and body: a contusion on the left side of the forehead, a laceration to the right ear, a hemorrhage in the conjunctiva in his right eye, small abrasions on his upper right neck and chest area, contusions on both elbows, and multiple injuries to his chest caused by blunt trauma. *Id.* at 173-81.

[8] On November 10, Anderson turned himself in to police. Detective Jose Torres interviewed Anderson. This interview was recorded on video ("the Interview"). State's Ex. 102. Anderson was informed of and waived his *Miranda* rights. During the Interview, Anderson admitted that he believed that he had killed Huggins. *Id.* at 9:20–12:30. He explained that he thought he killed Huggins when, while the two were having sex, he was choking Huggins at Huggins's request. *Id.* at 8:30–12:30. Anderson said that he was sorry and that it was a horrible accident. Anderson told Detective Torres, "[T]his is a man I loved, and I never had no, absolutely no intention in this world of hurting him." *Id.* at 28:30–28:36. Anderson admitted to Detective Torres that he used Huggins's debit and credit cards in the days following Huggins's death and that he had taken televisions and DVDs from Huggins's apartment to trade for drugs. *Id.* at 13:45–15:20.

[9]     During the Interview, Anderson also discussed an October incident involving himself and Huggins when police were called ("the October Incident"). *Id.* at 6:30–6:45; 7:17–7:59. He disclosed that one evening he wanted to buy cocaine while Huggins wanted to buy marijuana, and they began to argue about which drug to buy. During the argument, Anderson pushed Huggins into a dresser and, for a minute or two, kept Huggins from leaving the living room because he wanted Huggins to listen to him. Anderson said he was arrested that night and charged "with a few different things." *Id.* at 7:48–7:59.

[10]    Anderson also discussed his alcohol use on the night of the October Incident and the night of Huggins's death. He said that he and Huggins were in a great mood the night of Huggins's death, that they were drinking, and that Anderson let his "drinking get out of hand." *Id.* at 38:10–38:16. He explained, "I'm not the type of person that does this, and you can know, you can ask anybody that knows me. I'm, I am not a violent person, in the least bit, it's but when you introduce tons of alcohol into my system, I become an a\*\*hole." *Id.* at 38:33–38:50. Detective Torres then asked Anderson, "Is that what happened earlier when, when you [were] arrested for the battery and everything with [Huggins]?" *Id.* at 38:52–38:58. Anderson replied, "[Y]eah I was drunk then[.]" *Id.* at 39:00. Detective Torres queried, "So you have the tendency to become a little more violent when you (inaudible)." *Id.* at 39:03. Anderson responded, "Yeah when I…. when I drink a lot yeah. …. But uh but yeah, other than that, I mean unless I'm extremely whacked out of my mind, I don't put my hands on people. I just don't do it." *Id.* at 39:06–39:19.

[11] On November 14, the State charged Anderson with Count 1, murder; Count 2, murder while committing or attempting to commit robbery; and Count 3, robbery resulting in serious bodily injury. Prior to trial, the State filed a notice of intent to offer evidence about the October Incident pursuant to Indiana Evidence Rule 404(b), which Anderson opposed. Following a hearing, the trial court ruled that the evidence of the October Incident was admissible to show motive, absence of mistake or accident, and/or the nature and circumstances of the relationship between Anderson and Huggins. Also prior to trial, Anderson filed a motion in limine to exclude any evidence that he has a tendency to become violent when he is intoxicated, which the trial court denied. In addition, he filed a notice of proposed redactions to the Interview and objections to the admission of portions of the Interview that related to the October Incident and to his character while under the influence of alcohol, which the trial court also denied.

[12] At trial, the trial court admitted, over Anderson's objection, evidence related to the October Incident and to his use of alcohol and its effects on him. This evidence included portions of State's Exhibit 102, the video recording of the Interview, and State's Exhibit 103, the transcript of the Interview. It also included testimony from Officer Pepper Eldridge, the officer who responded to the October Incident, and photographs taken that night. However, the trial court granted Anderson's request for the following admonishment to the jury, which was given when Exhibits 102 and 103 were admitted:

This exhibit, which is a video recording that's going to be played for you here in a minute, you'll have State's Exhibit 103, which is the transcript. You'll have a copy of that transcript. It is a transcript that was prepared by someone who listened to it and typed it up. So there could be mistakes that were made in it. There could be typographical errors. What you hear is the evidence you can consider, all right. What you see is only an aid for you as you listen to the video recording and watch the video recording, okay. So if you see something different between the two, the evidence you can consider is what you hear and see, okay.

....

.... There will be evidence introduced that the defendant was involved in wrongful conduct other than those charged in the information. This evidence has been received solely on the issue of the defendant's motive, nature of the relationship between [Anderson] and [Huggins], and/or the absence of accident. This evidence should be considered by you only for those limited purposes. This evidence should be considered by you as evidence of the defendant's character.

....

[T]hanks for correcting me. ....  This evidence should not be considered by you as evidence of the defendant's character.

Tr. Vol. 3 at 17-18.

[13]    The Interview was played for the jury.  Before it was finished, the trial court took a recess.  The trial court informed the jurors that they could not keep Exhibit 103 and to leave it on their chairs.  *Id.* at 19.  There is no indication in

the record that the jurors failed to follow the trial court's instructions during this recess. After the recess, the trial court finished playing the Interview, and the State called Officer Eldridge to testify.

[14] Officer Eldridge testified that she responded to a request for police assistance on October 2 at about 9:00 p.m. She explained that police assistance was requested because somebody was pounding on a patio screen door and would not leave. When she arrived at the apartment building, a Mr. Yates approached her and told her that his friends "had a subject behind that residence detained," whom Officer Eldridge identified as Anderson. *Id*. at 30. Yates and his friends told Officer Eldridge that they saw their neighbor, Huggins, run out of his apartment after Anderson, and Yates and his friends chased Anderson because they thought a crime was occurring. Yates told Officer Eldridge that Anderson was carrying a backpack that contained a bottle of alcohol and a white sock containing another bottle of alcohol. One of the bottles of alcohol was open, and Officer Eldridge testified that Anderson had been drinking it. Yates and his friends did not report witnessing any violence between Anderson and Huggins, and Detective Eldridge did not observe any violence between Anderson and Huggins. However, Officer Eldridge observed that Huggins had a gash several inches long on the inside of his right forearm and that Huggins's front door frame had been kicked in. During Officer Eldridge's testimony, photographs taken that night were admitted over Anderson's objection, including a photograph of Anderson sitting on the curb in handcuffs, a photograph of his backpack and a bottle of alcohol, a photograph of the damaged door frame, and

photographs of the injury to Huggins's forearm. State's Exhibits 104, 105, 107, 108, 109.

[15] At the conclusion of Officer Eldridge's testimony, the State rested. The trial court took another recess. The jurors still had Exhibit 103, but the trial court did not instruct them to leave the exhibit on their chairs. Before the jury returned, the prosecutor reminded the trial court that Exhibit 103 needed to be collected. The trial court responded, "Yes, we do. I think they wanted to leave them here but were told to take them back. And I heard him do that, but I didn't think about the fact they had the transcripts and we hadn't pulled them." *Id.* at 40. From this comment, it appears that the jurors took Exhibit 103 with them into the jury room during this recess.

[16] When the jury returned, the defense presented its case. During Anderson's testimony, the jurors retained possession of Exhibit 103. Anderson testified that he loved Huggins, that Huggins asked him to choke him during sex, that he was uncomfortable doing so but agreed because he wanted Huggins to be happy, and that they had engaged in that sexual activity two or three times previously without any problem. Anderson testified that on the day of Huggins's death, he had been drinking since noon and was drunk when they went to bed to engage in sex, and that at some point he could not remember what happened. He said that he was still drunk when he woke up naked and lying partially on the right side of the bed. He saw Huggins lying on the ground and thought Huggins might be unconscious. He checked Huggins's pulse and checked to see if he was breathing and started "freaking out." *Id.* at 59. He testified that he carried

and dragged Huggins's body into the bathroom and put him in the bathtub. He did not remember putting more water in the bathtub, so he thought the water must have already been there from an earlier bath. He said he took Huggins's wallet, keys, and phone, and left in Huggins's car. He explained that he wanted to get high to help him forget the whole night. He denied that he meant for what happened to Huggins to happen. He also denied that what happened to Huggins was because he wanted money or because he wanted something Huggins would not give him.

[17] During Anderson's testimony, the trial court took another recess. The trial court did not instruct the jury to leave Exhibit 103 on their chairs, but there is no indication in the record that the jury took the exhibit with them during this recess. At the conclusion of Anderson's testimony and after defense counsel rested, the prosecutor reminded the trial court that Exhibit 103 had not been collected. The trial court then instructed the jurors to hand the exhibit to the bailiff. During closing argument, Anderson's counsel conceded that Anderson committed reckless homicide, but argued that the State's evidence did not support murder or robbery. The trial court provided final jury instructions, which included an instruction on reckless homicide. The jury found Anderson guilty on Count 1 and not guilty on Counts 2 and 3. The sentencing order incorrectly shows that Counts 2 and 3 were dismissed. Appellant's App. Vol. 2 at 16. The trial court sentenced Anderson to sixty years. This appeal ensued.

# Discussion and Decision

## Section 1 – The trial court did not abuse its discretion in admitting certain evidence.

[18] Anderson contends that evidence regarding (1) the October Incident and (2) his tendency to become violent when intoxicated was improper character evidence inadmissible under Indiana Evidence Rule 404.[2] We review evidentiary rulings for an abuse of discretion resulting in prejudicial error. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). An abuse of discretion occurs when the trial court's ruling is either clearly against the logic and effect of the facts and circumstances before it or the court misinterprets the law. *Id*. In determining whether improperly admitted evidence has prejudiced the defendant, we assess the probable impact of that evidence on the jury in light of all the other properly admitted evidence. *Id*. If independent, properly admitted evidence of guilt supports the conviction, the error is harmless. *Id*.

[19] Turning first to the evidence Anderson challenges regarding the October Incident, he focuses solely on Officer Eldridge's testimony and the corresponding photographic exhibits, which he contends were inadmissible under Indiana Evidence Rule 404(b). Rule 404(b) prohibits the admission of evidence of another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

---

[2] We reject Anderson's claim that the State failed to address either of his arguments regarding the admission of evidence simply because the State consolidated his arguments into one issue.

character." This rule is designed to prevent "the jury from indulging in the 'forbidden inference' that a criminal defendant's 'prior wrongful conduct suggests present guilt.'" *Fairbanks v. State*, 119 N.E.3d 564, 568 (Ind. 2019) (quoting *Byers v. State*, 709 N.E.2d 1024, 1026-27 (Ind. 1999)).

[20]  Although Evidence Rule 404(b) proscribes the use of evidence of prior bad acts to show character, it provides that such evidence may be admissible for other purposes, including, but not limited to, "motive, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake, or *lack of accident*." (Emphases added.) To determine whether evidence of prior bad acts is admissible, the trial court must first assess whether the evidence "is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Fairbanks*, 119 N.E.3d at 568. "The test for admission is whether or not the evidence is so specifically and significantly related to the charged crime in time, place and circumstance as to be logically relevant to one of the particular excepted purposes." *Reeves v. State*, 953 N.E.2d 665, 670 (Ind. Ct. App. 2011) (quoting *Malone v. State*, 441 N.E.2d 1339, 1346 (Ind. 1982)), *trans. denied*. If the proffered evidence meets the relevancy threshold, the trial court must then apply the balancing test required under Indiana Evidence Rule 403 and

determine whether the evidence's probative value is "substantially outweighed" by the danger of unfair prejudice.[3]

[21] The State argues that the October Incident evidence was admissible to show intent and lack of accident. Anderson asserts that Officer's Eldridge testimony and the photographic exhibits were not relevant to intent or lack of accident because the evidence showed no actual violence between the parties. We agree with the State.

[22] In order for evidence of prior bad acts to be admissible to show intent to commit the charged crime, the defendant must place his or her intent in issue. *Ceaser v. State*, 964 N.E.2d 911, 917 (Ind. Ct. App. 2012), *trans. denied*. Lack of accident is a subset of intent. *See Fairbanks*, 119 N.E.3d at 570 ("[W]hen the State seeks to introduce other-bad-acts evidence to disprove accident, the State wants to show the defendant had the requisite mens rea to commit the charged act."). Our supreme court has held that prior bad acts are relevant to negate a claim that the victim's death was accidental. *Crain v. State*, 736 N.E.2d 1223, 1235-36 (Ind. 2000).[4]

[23] Here, Anderson placed his intent and lack of accident in issue. To convict Anderson of murder under Count 1, the State was required to prove beyond a

---

[3] Evidence Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[4] Contrary to Anderson's claim, prior bad acts do not need to result in charges to be relevant under Evidence Rule 404(b).

reasonable doubt that Anderson knowingly or intentionally killed Huggins. Ind. Code § 35-42-1-1(1). At trial, Anderson admitted that he killed Huggins, but claimed it was an accident. Specifically, Anderson's defense was that on the night of Huggins's death, Anderson was extremely drunk and unknowingly and unintentionally killed Huggins while engaging in sexual activities by accidentally choking Huggins too hard.

[24] In the Interview, Anderson admitted that on the October night when police were called to Huggins's apartment, Anderson battered and confined Huggins during an argument and was arrested and charged with a few things. State's Exhibit 102 at 6:30–7:59. He also admitted that he was drunk. *Id*. at 39:00. Anderson does not challenge the admission of this evidence on appeal. Anderson also admitted during the Interview that he had been drinking that night. *Id*. at 38:52–39:03. Officer Eldridge's testimony regarding the October Incident and the photographic exhibits are directly connected to Anderson's admission that he had battered and confined Huggins and provided additional information to explain what happened that night. Specifically, Officer Eldridge's testimony and the photographs showed that Huggins was in fact injured that night, the extent of that injury and that the injury was probably not the result of an accident, and that Anderson was drinking alcohol that night. Therefore, the evidence was relevant to negate Anderson's claim that he accidentally caused Huggins's death.

[25] As for whether the probative value of the evidence of Anderson's prior wrongful conduct was substantially outweighed by the potential for unfair

prejudice such that it was inadmissible under Rule 403, we note that his prior wrongful conduct and the instant crime had significant similarities, most notably that they involved the same victim and that Anderson was drinking both times. It is also significant that the October Incident occurred just a few weeks before the charged crime. In addition, the trial court gave a limiting instruction and admonished the jury that Anderson's prior wrongful conduct was not admitted to demonstrate character or prove action in conformity therewith. Balancing the probative value on the issue of intent and lack of accident against the danger of unfair prejudice, we cannot say the trial court abused its discretion by admitting evidence of the October Incident.

[26] Turning now to Anderson's challenge to evidence regarding his tendency to become violent when intoxicated, he contends that certain portions of Exhibits 102 and 103 were inadmissible under Evidence Rule 404(a)(1), which provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."[5] Specifically, Anderson challenges the admissibility of his statements that alcohol causes him to "become an a\*\*hole[,]" that he has "the tendency to become a little more violent[,]" and that "unless I'm extremely whacked out of my mind, I don't put my hands on people." State's Exs. 102 and 103. Anderson argues that from this evidence the jury could have inferred

---

[5] Evidence Rule 404(a)(2) provides exceptions for a defendant or victim in a criminal case that are not relevant in this case.

that "because Anderson has the 'tendency' to get violent when he gets drunk, and because he was drunk at the time of the victim's death, he must have gotten violent and murdered Huggins." Appellant's Br. at 38. He compares the evidence here with character evidence that this Court concluded was inadmissible in *Oldham v. State*, 779 N.E.2d 1162 (Ind. Ct. App. 2002), *trans. denied* (2003). That case is distinguishable. The evidence in that case included business cards with mafia names on them and novelty cards with Oldham's photograph and captions such as "Considered armed and dangerous." *Id*. at 1171. On appeal from his murder conviction, Oldham argued that the evidence gave rise to the impermissible inference that he was a person with a dangerous and criminal character and that the murder was entirely consistent with his character and prior bad acts. *Id*. at 1172. The State argued that the business and novelty cards were admissible to show Oldham's ownership of a shirt because the evidence was found in close proximity to the shirt. *Id*. The *Oldham* court rejected the State's argument because the transcript showed that the State did not attempt to link Oldham's ownership of the shirt with the location of the challenged evidence. *Id*. at 1172-73. Rather, when Oldham took the stand to testify, the prosecutor showed him the business and novelty cards and asked him such things as whether he considered himself to be armed and dangerous. *Id*. at 1172. The *Oldham* court concluded that the prosecutor's questioning showed that "the prosecutor did not present the items as harmless novelty items, but tried to use the business cards and the novelty photograph to paint Oldham as a dangerous criminal. This evidence was obviously inadmissible under Evidence Rule 404. *Id*. at 1172-73.

Anderson's argument ignores the context in which he made the challenged statements and the fact that he made them in an attempt to excuse his actions on the night of Huggins's death and the night of the October Incident. When Anderson made the challenged statements in the Interview, he was asserting that he was "not a violent person," but he let his "drinking get out of hand" when he killed Huggins and he would not have killed Huggins if he had not been drinking. State's Ex. 102 at 38:10–38:16; 38:33–38:50. Thus, his statements were directly connected to his state of mind on the night of Huggins's death. In addition, Anderson agreed in the Interview that he was in a similar state of mind on the night of the October Incident. *Id*. at 38:52-39:19. We have already determined that evidence of the October Incident was relevant to the issue of Anderson's intent and lack of accident and admissible under Evidence Rule 404(b). Because the challenged statements were directly connected to the charged crime and the October Incident and reflected Anderson's state of mind on those particular instances, we cannot say that the trial court abused its discretion in admitting these statements.

## Section 2 – The trial court's failure to immediately collect Exhibit 103 did not result in fundamental error.

Anderson asserts that the trial court committed reversible error by allowing the jurors to take Exhibit 103 to the jury room during a recess, and to retain possession of it during Officer Eldridge's testimony and Anderson's testimony. Generally, a trial court's decision to allow the jury to take exhibits into the jury room is reviewed for an abuse of discretion. *Thacker v. State*, 709 N.E.2d 3, 7

(Ind. 1999); *Mays v. State*, 907 N.E.2d 128, 132 (Ind. Ct. App. 2009), *trans. denied*. Here, the trial court inadvertently allowed the jurors to take Exhibit 103 into the jury room during one trial recess. Accordingly, the trial court cannot be said to have exercised any discretion in this matter. However, Anderson does not assert, nor does anything in the record suggest, that defense counsel was unaware that the jury had the exhibit during a recess, during Officer Eldridge's testimony, and during Anderson's testimony. Defense counsel could have objected that Exhibit 103 had not been collected and requested curative measures before Officer Eldridge or Anderson testified or when the trial court directed that the exhibit be collected after Anderson testified. If defense counsel had done so, any error or potential prejudice resulting from the jury's inadvertent possession of the exhibit could have been addressed and cured during trial. Accordingly, we conclude that Anderson waived this issue for review.[6] *See Lake v. State*, 565 N.E.2d 332, 335 (Ind. 1991) (concluding that where defense counsel was present and did not call into question trial court's manner of handling jury, no error was preserved for appeal); *see also Hennings v. State*, 532 N.E.2d 614, 616 (Ind. 1989) (applying fundamental error standard of review where defendant failed to object when trial court permitted jury to take evidence into jury room for deliberations).

---

[6] Anderson asserts that we should review this issue "on its merits 'without insisting that the claim first be presented to the trial judge.'" Appellant's Br. at 27 (quoting *Piercefield v. State*, 877 N.E.2d 1213, 1218 (Ind. Ct. App. 2007), *trans. denied*). However, the cases Anderson relies on apply to claims of error involving probation conditions and sentencing, and we find no principled basis to apply the standard of review in those cases to the very different claim of error raised here.

[29] Because Anderson has waived this issue, he may win reversal of his conviction only by establishing that the jury's possession of the exhibit under the circumstances resulted in fundamental error:

> In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. The error must be so prejudicial to the defendant's rights as to make a fair trial impossible. In considering whether a claimed error denied the defendant a fair trial, we determine whether the resulting harm or potential for harm is substantial. Harm is not shown by the fact that the defendant was ultimately convicted. Rather, harm is determined by whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled.

*Baker v. State*, 948 N.E.2d 1169, 1178-79 (Ind. 2011) (citations omitted).

[30] Although we have decided that the abuse of discretion standard does not apply here because Anderson waived the issue for review, we believe that some of the considerations applicable when the trial court exercises its discretion in deciding whether to send evidence to the jury room are helpful to our fundamental error analysis. Under the common law,[7] "the trial court should consider three factors in deciding whether to permit the jury to take a copy of the exhibits into the jury

---

[7] The procedure for allowing jurors to review evidence and testimony is governed by both case law and Indiana Code Section 34-36-1-6. However, Section 34-36-1-6 applies only after the jury retires for deliberations and the jurors explicitly indicate a disagreement as to any part of the testimony or a desire to be informed as to any point of law. *Hall v. State*, 897 N.E.2d 979, 982 (Ind. Ct. App. 2008).

room: (1) whether the material will aid the jury in a proper consideration of the case; (2) whether any party will be unduly prejudiced by submission of the material; and (3) whether the material may be subjected to improper use by the jury." *Hall v. State*, 897 N.E.2d 979, 982-83 (Ind. Ct. App. 2008) (citing *Thacker v. State*, 709 N.E.2d 3, 6 (Ind. 1999)).

[31]     Anderson argues that fundamental error occurred because

> the jury had the transcript in the jury room–isolated from all other evidence and without guidance from the trial court–it could have given the transcript undue weight or considered it for some improper use.  Moreover, rather than listen to Anderson's testimony, the only witness who provided an alternative to the State's narrative of murder, the jury might well have instead perused the transcript that contained prejudicial character evidence.

Appellant's Br. at 32-33 (citation omitted).

[32]     We are unpersuaded based on the following reasons.  First, we have already decided that Exhibit 103 did not contain inadmissible evidence, and therefore the danger of prejudice or misuse is not nearly as great as Anderson asserts. Second, the jurors received extensive guidance from the trial court when they were provided with Exhibit 103.  Specifically, the trial court informed them that the video recording of the Interview was the evidence they were to consider and that Exhibit 103 was only an aid to help them as Exhibit 102 was played.  Tr. Vol. 3 at 17.   The trial court also instructed the jury that Exhibits 102 and 103 contained evidence of prior wrongful conduct, but that that evidence was not to

be considered as evidence of Anderson's character and was only to be considered on the issues of Anderson's motive, the nature of the relationship between Anderson and Huggins, and the absence of accident. *Id*. at 18. Then, before the trial court dismissed the jury for the next recess, the trial court informed the jurors that they could not keep Exhibit 103 and to leave the exhibit on their chairs. *Id*. at 19. "When the jury is properly instructed, we will presume they followed such instructions." *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987)). Although the trial court did not repeat these instructions immediately before the following recess, when the jurors apparently brought the exhibit back to the jury room, there is nothing in the record to suggest that they did not adhere to the trial court's instruction that Exhibit 103 was just an aid to use while they watched Exhibit 102. The presumption that the jurors followed the trial court's instruction to treat Exhibit 103 only as an aid to Exhibit 102 is bolstered by the fact that during this recess, when the prosecutor reminded the trial court that Exhibit 103 needed to be collected, the trial court commented that the jurors wanted to leave the exhibit on their chairs. Tr. Vol. 3 at 40.

[33] Third, there is nothing in the record that suggests that the jurors were reading Exhibit 103 rather than listening to Anderson's testimony, and we presume that the jurors continued to heed the trial court's instruction that the exhibit was just an aid to the video recording. And fourth, Exhibit 103 was substantially similar to Anderson's trial testimony. Exhibit 103 contained Anderson's statements that he loved Huggins, that he would never want to hurt him, and that

Huggins's death was a terrible accident. Therefore, Exhibit 103, like Anderson's testimony, supported Anderson's defense that Huggins's death was accidental. As such, we cannot say that the exhibit was unduly prejudicial.

[34] Clearly, the trial court erred in failing to immediately collect Exhibit 103 after Exhibit 102 was finished playing, and the jurors improperly retained Exhibit 103 during a recess and during Anderson's testimony. However, the potential for Exhibit 103 to be used improperly by the jury or be given greater weight than other evidence was negligible given the trial court's instructions and the jurors' apparent willingness to follow the court's instructions.[8] We conclude that the error did not deprive Anderson of a fair trial, and therefore the error did not rise to the level of fundamental error.[9]

---

[8] This case is nothing like the case of *Thomas v. State*, 259 Ind. 539, 539-41, 289 N.E.2d 508, 509-10 (Ind. 1972), relied on by Anderson, in which our supreme court held that the trial court abused its discretion in permitting the jury to take a witness's statements in the jury room during deliberations because the statements were admitted solely as prior inconsistent statements to impeach the witness and could have been improperly used for the truth of the matter contained therein. Likewise, Anderson's reliance on *Toohy v. Sarvis*, 78 Ind. 474 (1881), is unavailing because that case, too, is very different. In that civil case, our supreme court reversed the denial of the defendant's motion for a new trial because the jury, attended by the bailiff, was left to deliberate in the courtroom where papers in the cause had been inadvertently left and a juror read aloud to the other jurors one of the letters written from the defendant to the plaintiff. *Id.* at 475.

[9] Anderson also argues that the jury's possession of Exhibit 103 in the jury room during one recess violated his right "to be present in the courtroom at every stage of the proceedings requiring the presence of the jury," under the Indiana Constitution Article 1, Section 13. *James v. State*, 613 N.E.2d 15, 24 (Ind. 1993). Anderson's failure to object at trial waives this issue for our review. *See Long v. State*, 121 N.E.3d 1085, 1088 (Ind. Ct. App. 2019) (concluding that defendant's failure to object at trial waived his claim that his constitutional right to a public trial was violated). Waiver notwithstanding, we note that even were we to assume that Anderson's right to be present during trial was violated, the "mere fact that an alleged error implicates constitutional issues does not establish that fundamental error has occurred." *Nichols v. State*, 974 N.E.2d 531, 535 (Ind. Ct. App. 2012) (quoting *Schmidt v. State*, 816 N.E.2d 925, 945 (Ind. Ct. App. 2004), *trans. denied* (2005)). We have already concluded that fundamental error did not result from the jury's possession of Exhibit 103 in the jury room during a recess, and the fact that this alleged error involves a constitutional right does not change that conclusion.

## Section 3 – The trial court's failure to give a reasonable theory of innocence instruction does not constitute error, let alone fundamental error.

[35] Anderson asserts that the trial court committed fundamental error by failing to sua sponte give a reasonable theory of innocence instruction. The manner of instructing a jury lies largely within the discretion of the trial court, and we will reverse only for an abuse of discretion. *Randall v. State*, 115 N.E.3d 526, 529 (Ind. Ct. App. 2015). In reviewing the trial court's decision to refuse a proposed jury instruction, "we consider whether the instruction (1) correctly states the law, (2) is supported by the evidence, and (3) is covered in substance by other instructions that are given." *Id*. Here, Anderson failed to tender the instruction he contends should have been given, and therefore he failed to preserve the issue for appellate review. *See Ortiz v. State*, 766 N.E.2d 370, 375 (Ind. 2002) ("Failure to tender an instruction results in waiver of the issue for review."). To avoid waiver, Anderson must show that the court's failure to give the instruction resulted in fundamental error. *Id*.

[36] In *Hampton v. State*, 961 N.E.2d 480 (Ind. 2012), our supreme court carefully considered when a reasonable theory of innocence instruction should be required and what the specific content of that instruction should be. The supreme court concluded as follows:

> [B]ecause Indiana jurisprudence recognizes the importance of [a reasonable theory of innocence] instruction in certain cases involving circumstantial evidence but our case law reveals a reluctance to find reversible error for failure to give the

instruction if there is substantial direct evidence of guilt, we elect to apply the approach taken in [*Spears v. State*, 272 Ind. 634, 639-40, 401 N.E.2d 331, 335 (1980)] and direct that the "reasonable theory of innocence" instruction is appropriate only where the trial court finds that the evidence showing that the conduct of the defendant constituting the commission of a charged offense, the *actus reus*, is proven exclusively by circumstantial evidence. As discussed above, to deny the availability of a "reasonable theory of innocence" instruction whenever there is any direct evidence of the fact that a criminal offense has occurred … could render the instruction unlikely ever to be used, but requiring the instruction whenever there is *no* direct evidence of any single element would compel its use in almost all criminal cases because *mens rea* is often shown *only* by circumstantial evidence.

We thus hold that, when the trial court determines that the defendant's conduct required for the commission of a charged offense, the jury should be instructed as follows: *In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence*.

*Id*. at 490-91.[10]

[37]    Anderson argues that a reasonable theory of innocence instruction should be required where a defendant's mens rea is established exclusively by circumstantial evidence and is the central issue at trial. However, in *Hampton*, our supreme court specifically held that the instruction is appropriate *only*

---

[10] "The Latin phrase 'actus reus' refers to the 'wrongful deed that comprises the physical components of a crime and that generally must be coupled with the mens rea [the criminal state of mind], to establish criminal liability.'" *Hampton*, 961 N.E.2d at 487 n.5. (quoting BLACK'S LAW DICTIONARY 41-42 (9th ed. 2009)).

where the trial court finds that the actus reus is proven exclusively by circumstantial evidence. *See id*.; *see also Spears*, 272 Ind. at 639-40, 401 N.E.2d at 335 (holding that reasonable theory of innocence instruction was *not* required on charge of assault with intent to kill where evidence of assault was direct and evidence of intent to kill was circumstantial). "Supreme court precedent is binding upon us until it is changed either by that court or by legislative enactment." *Stafford v. State*, 83 N.E.3d 721, 725 (Ind. Ct. App. 2017) (quoting *Dragon v. State*, 774 N.E.2d 103, 107 (Ind. Ct. App. 2002), *trans. denied* (2003)). Accordingly, we find no error, let alone fundamental error.

## Section 4 – The sentencing order needs correction.

[38] Last, Anderson asserts, and the State concedes, that the sentencing order incorrectly indicates that the two counts for which Anderson was found not guilty were dismissed. Appellant's App. Vol. 2 at 16. We agree, and therefore remand to amend the sentencing order to state that Anderson was found not guilty of Counts 2 and 3.

[39] Based on the foregoing, we affirm Anderson's conviction and remand for correction of the sentencing order.

[40] Affirmed and remanded.

Bradford, J., and May, J., concur.