## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2020, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEY FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Elbert Briggs,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 23, 2020

Court of Appeals Case No.
19A-CR-1884

Appeal from the
St. Joseph Superior Court

The Honorable
Elizabeth C. Hurley, Judge

Trial Court Cause No.
71D08-1811-MR-08

**Vaidik, Judge.**

# Case Summary

[1] Elbert Briggs appeals his conviction for murder, arguing that the trial court erred by denying his motion for mistrial and by admitting certain evidence. We disagree and affirm.

# Facts and Procedural History

[2] Around 3:40 a.m. on June 23, 2018, Eric Phillips pulled into the parking lot of the Notre Dame boathouse on the St. Joseph River in South Bend. He was accompanied by Tastacia Parker—Briggs's on-again/off-again girlfriend. Shortly after Phillips and Parker arrived, two men approached on foot. After a brief interaction, one of those two men drew a gun and shot Phillips twice—once in the chest and once in the arm. Phillips fell in the parking lot and died. Parker and the other men ran off.

[3] Several months later, the State charged Briggs and Parker with murder. The State's theory was that Briggs and Parker wanted to rob Phillips, that Parker got Phillips to the river for that purpose, and that Briggs was the shooter. Briggs's case proceeded to a jury trial in June 2019.[1] The State's evidence was largely circumstantial but substantial.

---

[1] Parker was charged and prosecuted separately from Briggs. After Briggs was convicted and sentenced, the State dropped the murder charge against Parker in exchange for her plea of guilty to Level 5 felony assisting a criminal and Level 6 felony perjury. She was sentenced to four years in prison and two years of community corrections. *See State v. Parker*, No. 71D01-1901-MR-1.

[4] A little over two months before the shooting, on April 12, 2018, Phillips contacted Parker on Facebook. A few hours later, Parker was messaging with Briggs and said, "we could poke dude[.]" Ex. 87c. According to Parker, "poke" means rob. Tr. Vol. II p. 167. Briggs asked, "Who[?]" Ex. 87c. Parker answered, "He pulled up on me ima drop top and super thirsty he old too . . . Like 35 I think he said[.]" *Id.* (Phillips was 37, and Parker testified that "thirsty" means gullible. Tr. Vol. II p. 166.) Briggs responded, "Ok do that[.]" Ex. 87c. Parker then asked, "You with me on it[?]" *Id.* Briggs answered, "Yeah[.]" *Id.*

[5] Then, on the night of June 22—about eight hours before the shooting—Parker received the following Facebook message from a friend:

> You a grown woman... and you have two kids. We do alot of stupid sh*t but we are NOT RATCHET… that's bummy af. You 22 years old, **if you have to rob anybody** while you have a whole ni**a you OBVIOUSLY need to reevaluate your life and the people in it. And any real ni**a would NEVER out his bi*ch in that predicament. He is using you. Kaylin and butter slid in SO MANY ni**as. He never even let me know his moves cause he said that's not my place period!! You got babies you need to be around for. And you talented af and finished Ross. You can be doing so much more. That's why I be saying f*** these ni**as. He either gone build you or be yo downfall …aint no in between.

Ex. 87a (emphasis added). Apparently unpersuaded by that message, Parker started a Facebook conversation with Phillips shortly after midnight. Phillips said that he was on his way to South Bend, and Parker said, "Let me know when u make it we can link I'm bored[.]" Ex. 87b. Around 1:00 a.m., Parker asked Phillips if he wanted to walk by the river and "Smoke n sip[.]" *Id.*

[6]     At some point Phillips picked Parker up in his car. Cell-phone location records show that Phillips's phone, Parker's phone, and Briggs's phone were near each other in the Edison Park area, east of the boathouse, around 3:35 a.m. As Phillips's phone approached the boathouse around 3:40 a.m., so did Briggs's phone (the location information for Parker's phone is more limited, but there is no dispute that she was with Phillips). Phillips was shot just before 3:45 a.m. Within thirty minutes of the shooting, Briggs's phone and Parker's phone were traveling southeast out of South Bend, toward Fort Wayne. The phones arrived in Fort Wayne around 6:00 a.m. and were in close proximity to each other at several points between 6:30 a.m. and 8:00 a.m. Both phones were active in Fort Wayne for the rest of the day. In the days that followed, the phones traveled together to West Palm Beach, Florida, where Parker's father lives. Late on June 24, Briggs sent the following Facebook messages to someone named Quan Briggs: "I'm gone bro to Florida don't say sh*t but all I can say is remember the last place we seen tay bd right hand mans at look that up"; "I love you gone call when I can"; "That's why I didn't come back"; "Bruh real sh*t u got to come this way when sh*t get right I'm gone be gone until a week[.]" Ex. 203B.

[7]     In addition to the Facebook and phone records, the State collected some physical evidence. Most relevant here, surveillance video from the boathouse showed the shooting (from a distance—the faces of the participants are not identifiable), a footprint was found in the mud near Phillips's car, and a bullet was lodged in Phillips's arm.

[8]     Detective Timothy Wiley, the lead investigator, testified about the surveillance video and three photographs that Parker sent to Briggs via Facebook approximately nine hours before the shooting. Two of the photographs show Briggs by himself, wearing a white shirt, dark jeans, and white shoes with orange or brown soles. *See* Exs. 88d, 88e. The third photograph show Briggs, wearing the same outfit, with Parker. *See* Ex. 88f. Detective Wiley believed the outfit Briggs was wearing in the photographs "seemed to be the same" as the outfit the shooter was wearing in the surveillance video. Tr. Vol. III p. 80.

[9]     Detective Wiley also testified that after seeing the footprint at the scene and the Facebook photographs that show Briggs wearing white shoes with orange or brown soles, he did internet research and found a Fila F-13 shoe, which was white with an orange sole. Photographs of the Fila shoe and its sole, along with photographs of the footprint at the scene, were admitted into evidence. Exs. 25, 25a, 25b, 25c, 25d. Detective Wiley testified that he saw "similarities between the Fila and the footprint," specifically, a "scalloped edge," a circle "very close to that scalloped edge," another circle on the "other side," and a "waffle" pattern "in the middle[.]" Tr. Vol. III pp. 158-59.

[10]    Ray Wolfenbarger, a firearm and tool-mark examiner, testified about the markings on the bullet found in Phillips's arm. He said that SCCY Industries is the only firearm manufacturer he knew that could have made the gun that left those markings. The State also presented a photograph posted on Facebook on June 8, 2018—fifteen days before the shooting—showing Briggs with a handgun tucked into his pants. *See* Ex. 88a. Part of the gun, including the grip,

is visible in the photograph. Detective Wiley testified that he is familiar with SCCY firearms, that he zoomed in on the handgun in the photograph, and that he saw "characteristics" of an SCCY. Tr. Vol. III p. 161. Specifically, he said that he could see the "finger grooves" on the front of the grip, "at least shadows" of holes on the back of the grip, a silver "slide," and a black "extractor." *Id.* at 161-62.

[11] The jury found Briggs guilty, and the court sentenced him to sixty-five years in prison. Briggs now appeals.

# Discussion and Decision

[12] Briggs contends that the trial court erred by denying a motion for mistrial he made based on a question that the prosecutor asked. He also argues that the trial court erred by allowing Detective Wiley to testify about the footprint found at the scene and by admitting the photograph of Briggs with a gun.

# I. Denial of Motion for Mistrial

[13] Briggs's motion for a mistrial related back to a recorded interview of Parker by Detective Gery Mullins. During that interview, Parker did not say that Briggs was involved in the shooting, but she made the following statement: "Whatever they had going on it wasn't, like, intentionally." Supp. Tr. p. 3; Ex. 204. (The record does not disclose the question Parker was responding to or provide any other context for her statement.) Parker was asked about that statement at trial, where the State called her as a witness under a grant of use immunity. She

testified that she didn't remember making the statement and that she was "not sure" whether the shooting was intentional. Tr. Vol. II p. 156.

[14] Later, the prosecutor sought to impeach Parker by asking Detective Mullins the following question about the interview: "[W]hen you talked to Ms. Parker, did she indicate to you whether or not she thought the shooting **by the defendant** was intentional?" Tr. Vol. III p. 68 (emphasis added). Detective Mullins answered, "She indicated that she didn't think it was intentional." *Id.* Briggs immediately objected and moved for a mistrial, arguing that the prosecutor's reference to "the shooting by the defendant" had "left the jury with the impression that [Parker] said something about [Briggs] actually being there." *Id.* at 69. The trial court sustained Briggs's objection but declined to order a mistrial, instead giving the jury the following admonishment:

> I'm striking from the record that question that was asked and the answer that was given, and so you are -- if you recall the instruction that I gave at the start of the trial, when I strike things from the record, you are to treat it as though you had never heard it, and it can't be part of your consideration.

*Id.* at 70. After the admonishment, the prosecutor asked Detective Mullins the same question without the reference to Briggs: "In interviewing Ms. Parker, did she indicate she didn't believe the shooting was intentional?" *Id.* Detective Mullins answered, "She did indicate that it wasn't intentional." *Id.* The State then played a recording of Parker telling Detective Mullins, "Whatever they had going on it wasn't, like, intentionally."

Briggs argues that the trial court should have granted his request for a mistrial.[2] As Briggs acknowledges, "a mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Mickens v. State*, 742 N.E.2d 927 (Ind. 2001). Because the trial court is in the best position to gauge the circumstances surrounding an event and its impact on the jury, we afford great deference to its decision on a motion for mistrial. *Id.* "We therefore review the trial court's decision solely for abuse of discretion." *Id.*

"A mistrial is appropriate only when the questioned conduct is so prejudicial and inflammatory that the defendant was placed in a position of grave peril to which he should not have been subjected." *Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008) (formatting altered). Briggs contends that he was placed in grave peril because the prosecutor's question "improperly suggest[ed] that the shooting was actually by the defendant" and "ma[de] the jury think that Parker had given a pretrial statement to Mullins where she had admitted that Briggs was the shooter but that she didn't think that it was an intentional shooting." Appellant's Br. p. 19. He also argues that, because Parker testified at trial that Briggs was not involved in the shooting, the prosecutor's question implying that

---

[2] The State contends that Briggs waived this issue by failing to renew his request for a mistrial after the trial court denied his original request and instead admonished the jury to disregard the question and answer. The State argues that to preserve the issue for appeal, Briggs was required to "request a mistrial following the admonishment or indicate to the court that the admonishment was not satisfactory." Appellee's Br. pp. 10-11. We disagree. By immediately moving for a mistrial, Briggs made clear his position that no admonishment would adequately remedy the issue.

Parker said something different before trial "likely had a devastating effect on her credibility." *Id.* at 21.

[17]  There are two problems with Briggs's argument. First, he does not acknowledge or address the well-established presumption that an admonishment by the court cures any harm caused by a prosecutor's improper statement. *Jones v. State*, 101 N.E.3d 249, 258 (Ind. Ct. App. 2018), *trans. denied*. Here, shortly after the prosecutor asked the erroneous question, the trial court told the jury that it was striking the question from the record and admonished the jury "to treat it as though you had never heard it, and it can't be part of your consideration." We presume the jury heeded that instruction and disregarded the prosecutor's question.

[18]  Second, Briggs does not acknowledge or address the fact that after the prosecutor's question and the court's admonishment, the recording of Parker's statement about the shooting being unintentional was played for the jury. As noted by the State, this allowed the jury to "hear for themselves that Parker never stated the shooting was by Defendant." Appellee's Br. p. 15. Even if the prosecutor's question led any jurors to believe that Parker identified Briggs as the shooter, the recording revealed that she did not.

[19]  For these reasons, we cannot say that the trial court abused its broad discretion in denying Briggs's request for a mistrial.

# II. Admission of Evidence

When a party challenges a trial court's discretionary decision to admit evidence, we review that decision only for an abuse of discretion. *Fairbanks v. State*, 119 N.E.3d 564, 567 (Ind. 2019), *cert. denied*. The admission of evidence constitutes an abuse of discretion when it is clearly against the logic and effect of the facts and circumstances. *Id.* at 568.

## A. Detective Wiley's testimony about the footprint

Briggs contends that the trial court abused its discretion by allowing Detective Wiley to "give testimony regarding [the] footprint found in the mud in the boat house parking lot." Appellant's Br. p. 21. He acknowledges that a witness is generally allowed to give their opinion that a footprint and the sole of a shoe are similar, provided they base their conclusion "'on measurements or peculiarities of the footprints.'" *McNary v. State*, 460 N.E.2d 145, 147 (Ind. 1984) (quoting *Johnson v. State*, 177 Ind. App. 501, 505, 380 N.E.2d 566, 569 (1978)). However, he argues that Detective Wiley "didn't testify about any measurements which he performed nor did he give specifics about peculiarities of the footprints." Appellant's Br. p. 22. He is right about measurements but wrong about peculiarities. As detailed above, Detective Wiley testified that he saw "similarities" between the footprint and the sole of the Fila F-13 shoe he found on the internet, including a "scalloped edge," a circle "very close to that scalloped edge," another circle on the "other side," and a "waffle" pattern "in the middle[.]"

It is true that the State did not have an actual shoe from Briggs and that Detective Wiley was not able to say definitively that Briggs was wearing Fila F-13 shoes in the Facebook photographs. However, having reviewed the photographs of the F-13 shoe and the Facebook photographs of Briggs, we agree with the State that the F-13 shoe is "very similar" to the shoes Briggs was wearing in the Facebook photographs. Appellee's Br. p. 17. And though it could not be said with certainty that Briggs was wearing F-13 shoes in the Facebook photographs, this was not an issue of the admissibility of Detective Wiley's testimony but rather, as the trial court explained, "a weight issue" that "can be cross examined on." Tr. Vol. III pp. 137-38. Ultimately, the jury had all of the photographs—of the footprint at the scene, of the F-13 shoe, and of Briggs wearing white shoes with orange or brown soles—and was able to decide for itself how much weight, if any, to accord to Detective Wiley's testimony. But the trial court had discretion to decide whether to admit that testimony in the first place, and Briggs has not convinced us that the court abused that discretion.

## B. Photograph of Briggs with a gun

Briggs also argues that the trial court erred by allowing the State to present the photograph of him with a handgun tucked into his pants. *See* Ex. 88a. He asserts that "[s]imple examination of the photograph demonstrates the weakness [of] the State's argument that the type of gun can be determined by an examination of that photograph." Appellant's Br. p. 25. Briggs is correct that not much detail is visible on the copy of the photograph in the record. In fact,

Detective Wiley acknowledged as much. Tr. Vol. III p. 161 ("It's very hard to see here in this photograph[.]"). However, he also testified that he zoomed in on the photograph and that it was "clear enough" for him to see characteristics of an SCCY firearm. *Id.* In light of that testimony, the limited detail in the handgun photograph goes to the weight of the evidence, not its admissibility. As with the footprint photographs, the jury had the handgun photograph and could decide how much weight to assign to it.

[24] Briggs contends that this case is like *Wilson v. State*, 770 N.E.2d 799 (Ind. 2002), where our Supreme Court held that the trial court erred by admitting into evidence a photograph showing the murder defendant with a handgun two months before the shooting at issue. In that case, however, the only fact supporting the admission of the photograph was that "two shell casings recovered from the crime scene were fired from a 9-millimeter handgun, a weapon similar to the type of weapon that Wilson was brandishing in the photograph." *Id.* at 801. There was "no link between the shell casings recovered at the crime scene and the photograph the State introduced at trial." *Id.* at 802. Here, on the other hand, a firearm examiner testified that the bullet found in Phillips's arm was likely fired from an SCCY, and Detective Wiley testified that the handgun in the photograph of Briggs had characteristics of an SCCY. That testimony established at least some link between the photograph and the shooting. *Cf. Pickens v. State*, 764 N.E.2d 295, 299 (Ind. Ct. App. 2002) ("Evidence that a defendant had access to a weapon of the type used in a crime

is relevant to a matter at issue other than the defendant's propensity to commit the charged act."), *trans. denied*.

[25] Finally, Briggs asserts that the photograph "was not probative of whether or not Briggs was involved in the shooting of Eric Phillips" and that it "should have been deemed inadmissible under [Evidence] Rule 403, as its probative value was outweighed by undue prejudice, confusion of the issues and misleading the jury." Appellant's Br. p. 25. We disagree. First, for the reasons already stated, evidence that Briggs possessed an SCCY firearm two weeks before the shooting **was** probative of whether he was involved in the shooting. Second, beyond simply noting that the photograph shows him "shirtless, flexing his muscles," *id.*, Briggs does not offer any reasoning or cite any caselaw in support of his claim that there was a danger of "undue prejudice, confusion of the issues and misleading the jury." If there was no evidence linking the gun in the photograph to the shooting, we would probably agree with Briggs. But there was such evidence, so we fail to see how the jury would have been confused or misled by the photograph or how the prejudice was "undue."

[26] The trial court did not abuse its discretion by admitting the photograph.

[27] Affirmed.

May, J., and Robb, J., concur.