# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 18 2020, 9:22 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Angela Field Trapp
Trapp Law, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rashaun Howard, *Appellant-Defendant,* | August 18, 2020 |
| | Court of Appeals Case No. 19A-CR-2762 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Barbara Crawford, Judge |
| | Trial Court Cause No. 49G01-1805-F3-14537 |

**Vaidik, Judge.**

# Case Summary

[1] Rashaun Howard appeals his conviction for Level 3 felony rape. He argues that the trial court erred by admitting his interview with police and that the evidence is insufficient to support the conviction. We affirm.

# Facts and Procedural History

[2] The evidence most favorable to the conviction is as follows. Howard and his biological sister, D.L., were adopted by different families at very young ages, but they were raised to know each other as siblings, and their families celebrated some special occasions together. One Saturday in April 2018, D.L. celebrated her sixteenth birthday with a party at her family's house. Howard, who was seventeen, attended the party with his family. As the party ended, D.L. asked to spend the night at Howard's house, and her parents agreed. This was not unusual, since D.L. and Howard only saw each other once or twice a year for special occasions and they often spent the night at each other's houses after the celebration ended.

[3] Howard was scheduled to work at Arby's, so D.L. played video games in Howard's bedroom with his nieces and nephew until he returned. When Howard returned from work, he took a shower, and his nieces and nephew left his bedroom. After showering and redressing, Howard sat on a mattress on his bedroom floor and played video games. Meanwhile, D.L. lay in Howard's twin bed, watching YouTube videos and texting friends on her phone. At some

point, Howard "died" in the video game he was playing and moved up onto the bed with D.L. Tr. Vol. III p. 12. D.L. wanted to go to bed, so she plugged her phone into a charger on the bedside table and lay down. Howard then moved so he was lying behind her. D.L. was uncomfortable that Howard was so close to her and "didn't want him right there." *Id.* at 14. Howard then put his right arm around D.L.'s side. In response, D.L. rolled over onto her back so she was facing up, looking at the ceiling. She then sat up to check her phone, saw it was 11:00 p.m., and lay back down on her back. Howard touched her again. He "started with [her] legs first," touching her "[a]s if he was going to take [her] pants off," but he took his pants off first. *Id.* at 16-17. He took off D.L.'s pants and underwear. D.L. said nothing while Howard did this, and he said nothing to her. Then Howard put his penis inside D.L.'s vagina. D.L. said "Stop," but he said, "Shhh." *Id.* at 47. D.L. also pushed Howard with her hands but couldn't get him off of her. *See id.* After about five minutes, Howard took his penis out of D.L.'s vagina and ejaculated on the bedsheets. D.L. lay there "for a few seconds" before picking up her pants, putting them back on, and going to the bathroom. *Id.* at 20. When D.L. returned to Howard's room, he was back to sitting on the mattress on the floor playing video games, so she lay down on the bed and went to sleep.

[4] The next morning, D.L. went with Howard and his family to church. After church, D.L.'s father picked her up. She was quiet the whole ride home and didn't tell her father what happened because she "was confused" and "didn't think that [her] own brother would do something like that to [her]." *Id.* at 24.

D.L.'s mother later testified that when D.L. got home, she "seemed really tired" and "slept the rest of the entire day." Tr. Vol. II p. 207.

[5] On Monday, D.L. went to school. Her friend, T.A., noticed that D.L. was "a little off" and asked what was going on. *Id.* at 228. D.L. told T.A. what happened with Howard on Saturday night. T.A. then told a teacher that something had happened to D.L. and that she needed to talk to the police. A school-resource officer spoke briefly to D.L. about what was going on. During their talk, D.L. was "very visibly upset" and spoke in a "[c]rying, shaky voice." *Id.* at 239. D.L.'s parents were then called to the school, and after they arrived, the family went to the Child Advocacy Center and spoke with Detective Michael Margetson. After telling Detective Margetson what had happened, D.L. and her mother went to Indiana University Health Methodist Hospital to complete a sexual-assault examination. As D.L. was being examined, Detective Margetson went to D.L.'s house to collect her clothing from Saturday night, including her underwear, which were stained with blood. *See* Ex. 11A.

[6] Detective Margetson then contacted the Howard family and asked to speak to Howard and his parents about "an investigation regarding his sister [D.L.]." Tr. Vol. II p. 14. Howard and his parents met Detective Margetson at the Child Advocacy Center, and he told them there was an allegation of "inappropriate conduct between [Howard] and [D.L.]." *Id.* at 26. Detective Margetson explained that because Howard was under eighteen years old, a parent had to be present during the interview. Howard's father accompanied Howard into the interview room, and Detective Margetson advised them of Howard's juvenile

rights. After advising them of his rights, Detective Margetson took Howard and his father into a different room, where there was no recording equipment, so that Howard and his father could discuss whether they wanted to speak with the detective. *See* Tr. Vol. III pp. 122-23. After a few minutes, Howard and his father told Detective Margetson they would speak with him. Detective Margetson then had both Howard and his father sign a juvenile waiver form and began the interview.

Initially, Howard admitted touching D.L. inappropriately on "her chest and butt on accident," but he then said he thought "somethin' else happened." Ex. 21. The following exchange occurred:

> [Detective Margetson]: Well the 'somethin' else happened' was kinda what the specific of what I need to get to. Because there's a pretty big part that's bein' left out. Which is pretty important for this discussion. And that's what I want you to tell me what the somethin' was that got left out. And if you don't feel comfortable discussing this, you can talk to your dad whether you wanna stay – for him or not. I mean this – this is – this is something that's gonna come out no matter what. Uh, but it – mean, I don't know if you feel comfortable saying this stuff in front of him or not but I – I need you to n- tell me the truth about what happened, okay?
>
> [Howard]: Mm-hmm. I think it would be easiest . . .
>
> [Howard's father]: What's that?
>
> [Howard]: If you weren't in here. So I can tell him what happened.

[Detective Margetson]: Are you okay with that?

[Howard's father]: Yeah.

*Id.* Howard's father then left the room, and Detective Margetson continued the interview. Howard admitted that he "took things a bit way too far, with the touching," and "it got outta hand." *Id.* Howard said that he put his penis inside D.L.'s vagina, that she had told him to "stop," and that he did not listen and "kept going." *Id.* Howard further stated that when he touched D.L.'s legs, she moved his hand away "twice," but he put it back each time. *Id.* Howard also told Detective Margetson that D.L. tried to push him off with her hands and told him to stop a second time. *See id.* Howard explained that after the second time D.L. told him to stop, he "realized what [he] was doing" and "got off" D.L. *Id.* Following the interview, Howard was arrested and charged with Level 3 felony rape when compelled by force or imminent threat of force.

[8]  In April 2019, Howard moved to suppress his interview with Detective Margetson. He argued that Detective Margetson did not give him and his parents adequate notice of the charges against him before they signed the juvenile waiver form. *See* Tr. Vol. II p. 89. The State responded that Detective Margetson told Howard and his parents there were allegations of misconduct made by D.L. against Howard and that was all that was required of him. *See id.* at 91. The State also noted that at the time of the interview, Detective Margetson did not know what charges would be filed since charging decisions

are made by the prosecutor. *See id.* The trial court denied Howard's motion to suppress. Howard's case then proceeded to a jury trial in September 2019.

[9] At trial, Howard admitted that he had sexual intercourse with D.L., so the sole issue before the jury was determining whether there was force. In addition to the details set forth above, D.L. testified that she did not want to have sex with Howard. *See* Tr. Vol. III p. 19. D.L. also said that she started her period on Monday, the day she was examined at the hospital. *See id.* at 44. Forensic Nurse Jennifer Waters-Gillen testified that she examined D.L. and found that D.L. had started her period that same day. Waters-Gillen said that during the exam, D.L. was "quiet, crying, looking down at the floor, wiping her tears. Very reserved. Didn't really, didn't say much, just more cried." *Id.* at 62. Waters-Gillen stated that D.L. told her that she said "no" to Howard several times and that Howard forced his penis inside her vagina. *See id.* at 78. The State also played an audio recording of Howard's interview with Detective Margetson for the jury.

[10] During closing arguments, the defense argued that D.L.'s testimony was inconsistent, that the blood found in her underwear was from her period, and that D.L. was accusing Howard of rape because she regretted having sex with him. *See id.* at 207, 211. In response, the prosecutor argued that D.L.'s testimony was consistent, that D.L. did not start her period until Monday so the blood stains on her underwear from Saturday night could indicate force, and that Howard owed D.L. "a duty as another human being" and "it might have been a greater duty because he is her biological brother. She trusted him . . . and

he violated that trust." *Id.* at 216-17. The jury found Howard guilty. The trial court sentenced Howard to eight years, with two years executed in the Department of Correction, two years to be served on home detention through Community Corrections, and four years suspended.

[11] Howard now appeals.

# Discussion and Decision

## I. Admission of Interview

[12] Howard contends that certain procedural safeguards for the waiver of a juvenile's constitutional rights were not followed and that therefore the trial court erred in admitting his interview with Detective Margetson into evidence.

[13] The State bears the burden of proving beyond a reasonable doubt that the juvenile received all the protections required by Indiana Code section 31-32-5-1 and that both the juvenile and their parent knowingly and voluntarily waived the juvenile's rights. *D.M. v. State*, 949 N.E.2d 327, 334-35 (Ind. 2011). We review a trial court's discretionary decision to admit evidence only for an abuse of discretion. *Fairbanks v. State*, 119 N.E.3d 564, 567 (Ind. 2019), *cert. denied*. The admission of evidence constitutes an abuse of discretion when it is clearly against the logic and effect of the facts and circumstances. *Id.* at 568.

[14] Indiana Code section 31-32-5-1 provides, in relevant part:

Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:

\* \* \* \*

(2) by the child's parent . . . if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver[.]

Furthermore, in determining whether any waiver of rights during custodial interrogation was made knowingly and voluntarily, the trial court shall consider all the circumstances of the waiver, including the following:

(1) The child's physical, mental, and emotional maturity.

(2) Whether the child or the child's parent, guardian, custodian, or attorney understood the consequences of the child's statements.

(3) Whether the child and the child's parent, guardian, or custodian had been informed of the delinquent act with which the child was charged or of which the child was suspected.

(4) The length of time the child was held in custody before consulting with the child's parent, guardian, or custodian.

(5) Whether there was any coercion, force, or inducement.

(6) Whether the child and the child's parent, guardian, or custodian had been advised of the child's right to remain silent and to the appointment of counsel.

Ind. Code § 31-32-5-4.

Howard argues that because neither he nor his father was told that he was suspected of rape before signing the waiver, any consultation he had with his father would not have been meaningful and the waiver was not knowing and voluntary. *See* Appellant's Br. p. 26. In other words, Howard argues that both the meaningful-consultation and knowing-and-voluntary requirements were not met because Detective Margetson did not specifically advise him and his father that he was investigating an allegation of rape.

Regarding the meaningful-consultation issue, we have held that a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might affect his decision to confess. *Estrada v. State*, 969 N.E.2d 1032, 1042 (Ind. Ct. App. 2012) (citing *Colorado v Spring*, 479 U.S. 564, 576-77 (1987)), *trans. denied*. Here, Detective Margetson's pre-waiver advisements that he was investigating "inappropriate conduct between [Howard] and [D.L.]," Tr. Vol. III p. 26, were sufficient to put Howard and his father on notice that this was a serious matter, *see Estrada*, 969

N.E.2d at 1043. As such, Howard and his father were given an opportunity for meaningful consultation before signing the waiver.

[17] On the knowing-and-voluntary issue, it is true that Howard and his father were not specifically told that a rape charge was possible. However, informing a juvenile and their parents of the act with which the child is charged or of which the child is suspected is but one of the six nonexclusive factors to be considered when determining whether a waiver is made knowingly and voluntarily. *Estrada*, 969 N.E.2d at 1042. Standing alone, this factor is insufficient to render a waiver unknowing and involuntary. *Id.*; *see also Tingle v. State*, 632 N.E.2d 345, 352-53 (Ind. 1994) (rejecting an argument that defendant's waiver was not knowing and voluntary where a detective did not inform him or his grandmother of the possible offenses to be charged, that he could be charged as an adult, and that he could face a severe sentence). Instead, the trial court must consider all the circumstances of the waiver to determine whether it was made knowingly and voluntarily. *Estrada*, 969 N.E.2d at 1042.

[18] Here, seventeen-year-old Howard was just over a month shy of his eighteenth birthday when Detective Margetson called his parents, asking to speak with Howard about "an investigation regarding his sister [D.L.]." Tr. Vol. III p. 14. Howard and his parents voluntarily went to the Child Advocacy Center to speak to Detective Margetson. When the family arrived, Detective Margetson told them there was an allegation of "inappropriate conduct between [Howard] and [D.L.]." *Id.* at 26. Howard and his father accompanied Detective Margetson to an interview room, where he read them Howard's rights. Howard

and his father were then taken to a separate room, where they spoke privately about whether they wanted to speak to Detective Margetson. After a brief period, Howard and his father emerged and told Detective Margetson they would speak with him. Detective Margetson then advised Howard of his rights again, before both Howard and his father signed the waiver form. There is no evidence that Howard was physically, mentally, or emotionally immature for his age or that he or his father were coerced, forced, or induced to sign the waiver.[1]

[19] For all of these reasons, we find that the waiver was knowing and voluntary and that therefore the trial court did not abuse its discretion in admitting Howard's interview into evidence.

# II. Insufficient Evidence

[20] Howard next challenges the sufficiency of the evidence by arguing that the State failed to prove force beyond a reasonable doubt. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We will only consider the evidence supporting the verdict and any reasonable inferences that can be drawn from the evidence. *Id.* A conviction will be affirmed if there is

---

[1] To the extent that Howard also argues that his waiver was not knowing and voluntary due to his "mental and emotional maturity," he does not point to any evidence showing that the almost eighteen-year-old high-school junior, who also maintained a job at Arby's, lacked maturity or education such that the waiver was not knowing or voluntary.

substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[21] Our holding that the interview was properly admitted is fatal to Howard's sufficiency argument. During the interview, Howard admitted that D.L. moved his hand off her side twice, that she said "stop" twice, and that she tried to push him off her with her hands. *See* Exs. 20 (audio recording), 21 (transcript). And Howard admitted that despite D.L.'s attempts to push him away and get him to stop, he inserted his penis into her vagina. *See* Exs. 20, 21. We note that on appeal, Howard refers to his interview as a "confession." Appellant's Br. p. 28. In short, Howard himself admitted that he used force to have sexual intercourse with D.L.

[22] Moreover, D.L.'s testimony alone is sufficient to prove force. D.L. testified that she did not want to have sexual intercourse with Howard, that she said "stop," and that she tried to push him off her. To the extent that Howard argues D.L.'s testimony is inconsistent, it was up to the jury to resolve any inconsistencies. *See Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017).[2]

---

[2] Our finding that the State presented sufficient evidence to support the conviction is fatal to Howard's argument that the trial court erred by denying his motion for a directed verdict. Accordingly, we need not separately address this argument. Howard also argues that D.L.'s testimony was incredibly dubious and that therefore the incredible-dubiosity rule applies to this case. However, that rule does not apply here because Howard's own statement corroborates what D.L. said. *See Moore v. State*, 27 N.E.3d 749, 757-58 (Ind. 2015).

[23]     Accordingly, there was sufficient evidence for the jury to find that the State proved force beyond a reasonable doubt.[3]

[24]     Affirmed.


Bailey, J., and Baker, Sr.J., concur.

---

[3] Howard makes two additional arguments on appeal, both of which are without merit.

First, Howard contends that the trial court abused its discretion by holding a sidebar during voir dire after the prosecutor objected to one of the defense's questions. There is no evidence that the prospective jurors overheard any of the sidebar discussion such that Howard was prejudiced. As the State points out, sidebars are simply a procedural means by which to keep the parties on track when selecting a jury.

Next, Howard asserts that the prosecutor committed prosecutorial misconduct during her rebuttal closing argument when she said (1) that D.L.'s statements were consistent, (2) that Howard owed D.L. a duty "as another human being . . . it might have been a greater duty because he is her biological brother," and (3) that the blood stain on D.L.'s underwear from Saturday night were not from her period (that she started on Monday) and could be evidence of force. Howard concedes he did not object, move for an admonishment, or request a mistrial after any of the alleged misconduct and therefore must show fundamental error. And we see no fundamental error here because all three statements were based on evidence. *See Neville v. State*, 976 N.E.2d 1252, 1260 (Ind. Ct. App. 2012) (attorney may properly argue any logical or reasonable conclusions based on their own analysis of the evidence). Accordingly, we see no prosecutorial misconduct here, let alone enough to establish fundamental error.