

# IN THE
# Court of Appeals of Indiana

Rodregus Morgan,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Feb 25 2026, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

February 25, 2026

Court of Appeals Case No.
25A-CR-836

Appeal from the Marion Superior Court

The Honorable Marshelle Dawkins Broadwell, Judge

Trial Court Cause No.
49D07-2310-MR-30268

---

**Opinion by Judge DeBoer**
Judges Foley and Kenworthy concur.

**DeBoer, Judge.**

## Case Summary[1]

[1] After Tracy Harmon died from a gunshot wound to her head while sitting in a car with her long-time friend and father of her children, Rodregus Morgan, Morgan was charged with murder. Before trial, their daughter, Destiny, gave a deposition in which she said that Morgan had a long history of abusing Harmon, and he had started threatening to kill her in recent years. The State filed a notice that it intended to elicit testimony from Destiny at trial about these threats and their history of fighting. The trial court, however, only permitted the State to elicit testimony about a recent fight between Morgan and Harmon during which Morgan threatened to kill Harmon, and it found the older alleged incidents more prejudicial than probative.

[2] At trial, Destiny offered the limited testimony permitted by the trial court. Morgan's stepson, Michael Smith, was an eyewitness to the shooting, and he testified to his version of the events of that night. Morgan testified in his own defense and offered a different story. Morgan persuaded the trial court to give jury instructions on the lesser included offenses of voluntary manslaughter and reckless homicide, but the jury ultimately found him guilty of murder.

---

[1] We held a traveling oral argument in this case on February 9, 2026 at Indian Creek High School. We thank counsel for their superb advocacy and thoughtful answers to students' questions. We also extend our gratitude to our hosts at Indian Creek for a seamless event and their attentive questions. Lastly, thank you to Indian Creek's Future Farmers of America students for the exquisite homemade ice cream that we all enjoyed after the oral argument.

After the jury rendered its verdict, the trial court learned that Destiny's deposition, which was extraneous and inadmissible, had mistakenly been sent back with and considered by the jury. Morgan moved for a mistrial, asserting that the deposition was highly prejudicial and likely had an impact on the jury's verdict. The State disagreed, arguing that the error was harmless given the overwhelming evidence against Morgan, and the deposition was mostly cumulative. The court denied Morgan's motion for a mistrial. After sentencing, Morgan filed a motion to correct error in which he again requested a mistrial or for the court to set aside the judgment. The court also denied these requests. Morgan now appeals, asserting that the trial court erred in denying his motion to correct error. Finding reversible error, we reverse and remand with instructions.

## Facts and Procedural History

### 1. The Shooting

Morgan and Harmon knew each other for forty-five years and had four children together. Their romantic relationship ended when they were young, but they remained friends. In recent years, their relationship had become more tumultuous and they fought often.

On the morning of October 23, 2023, Harmon and Morgan left Harmon's house to run errands. When they stopped at a liquor store later that afternoon, Harmon bought alcohol and talked to friends while Morgan drank in his car and waited for her to return. As he waited, Morgan got into an argument with

a patron who asked him to turn his music down. He called Smith and asked him to get a gun. Morgan eventually left and went across the street to sit with friends. Later that night, Harmon asked Morgan for a ride. Since she didn't tell Morgan where she wanted to go, he drove to Smith's house and parked on the street in front of his home.

[6] Morgan and Harmon arrived around 8 or 9:00 p.m., and Smith went out to the car and sat with them for approximately thirty minutes. The group was drinking, and Morgan and Harmon were arguing. At some point, Harmon and Smith traded seats, with Harmon moving to the backseat and Smith moving to the passenger seat. Later, Harmon got back into the passenger seat and Smith went inside to retrieve Morgan's gun. A few moments after Smith returned with the gun, Harmon was shot on the left side of her head while she sat in the passenger seat.

[7] Smith went inside and called Destiny to tell her what happened, and then he called the police. Morgan stayed in the vehicle with Harmon until the police arrived and ordered him to exit the vehicle. They took him into custody and, as officers assessed Harmon's condition, they observed a handgun on the floorboard of the driver's area. Harmon had no pulse at the scene and was likely killed instantly given the trajectory of the bullet.

[8] The police took Morgan to the police station for an interview. *See* State's Exhibit 73. The officer read him his rights, and Morgan agreed to talk to him. Morgan appeared heavily intoxicated and slurred his speech. He told the

officer that when they got to Smith's house, Harmon was upset because Morgan wouldn't take her somewhere. He said he had owned the gun for two weeks and didn't know how Harmon was shot. Later, Morgan said that Harmon had grabbed the gun and shot herself.

[9] A few days later, Morgan was charged with murder, a felony.[2]

## 2. Pre-Trial

[10] The parties conducted depositions in preparation for trial. Destiny sat for a deposition in August 2024. When asked about her parents' relationship, Destiny said that Morgan had physically abused Harmon for "a long time" and that he had "a record going back from abuse on [Harmon]." Exhibits Vol. 1 at 160. She had witnessed a recent fight between the two where Morgan was intoxicated, "started beatin' on" Harmon, and hit her in the head with a bottle. *Id.* Destiny said that the pair were frequently arguing around the time of the shooting because of Morgan's drinking and neighbors complaining about his loud music. She said that, aside from a period when she had taken Morgan's gun from him, "[h]e always had it on him." *Id.* at 164. She explained that during their fights over the last two years, Morgan had started threatening that he would kill Harmon. On the day of the shooting, Harmon had called Destiny because "she [] felt like somethin' was gonna [sic] happen[.]" *Id.* at 162-63. She said that when Smith called her after the shooting, "[h]e said that they were

---

[2] Ind. Code § 35-42-1-1(1).

arguin', and dad reached for the gun and said, 'Move, Mike.' And just shot her in the head." *Id.* at 164. Destiny also stated that Morgan had threatened her in the past.

[11] In October 2024, the State filed a notice of intent to offer Rule 404(b) character evidence about Morgan. Specifically, it intended to elicit testimony that Morgan "was physically violent against [] Harmon on several occasions and had previously threatened to kill [her]," arguing that such evidence was "relevant to establish" Morgan's motive, his and Harmon's relationship, and the absence of accident. Appellant's Appendix Vol. 2 at 113. Morgan filed a motion in limine objecting to the State's use of any 404(b) evidence.

[12] Before voir dire began on the first day of trial, the court addressed the 404(b) matter. To show Morgan's motive, the State said it intended to call Destiny as a witness to testify about her parents' "tumultuous relationship, that they would get in fights, . . . and that during those fights, [] Morgan, especially leading up to the prior few years before this incident, had threatened to kill [Harmon.]" Transcript Vol. 2 at 31. Morgan argued that the evidence served no other purpose than to show his propensity for violence. The State tendered Destiny's deposition to the court for the limited purpose of assisting the court in deciding the 404(b) issue. The court ultimately granted Morgan's motion in limine in part and denied it in part, allowing the State to elicit only limited testimony from Destiny regarding past incidents. From the bench, the court reasoned:

> I think to show motive and contrary intent, I will allow the State
> to present . . . the most recent evidence . . . . The other matters

from a year before going years back I think are too remote in time and I think would be less probative with respect to intent. Me telling you five years ago that I'm going to kill you and I'm going to be killing you today, I don't think that's terribly probative. And I think at that point the prejudicial value does outweigh the probative. The prejudicial effect outweighs the probative value with respect to intent and motive. But the most recent evidence about just a couple of weeks leading up, I will allow the State to do that over Defense's objection.

*Id.* at 39-40. After the court's ruling, they proceeded to trial.

### 3. Trial and Verdict

[13] Over the course of the two-day trial, the State presented the following evidence: crime scene photographs, body camera footage, the gun found at the scene, Morgan's police interview, Smith's 911 call, and testimony from Destiny, Smith, law enforcement personnel, and the doctor who performed Harmon's autopsy. Morgan testified in his own defense.

[14] The State called Destiny as its first witness. She testified that around the time of the incident her parents' relationship was "rocky" and that they fought often. *Id.* at 141. She described a recent fight between her parents at her house, during which Morgan said to Harmon, "bitch, I'll kill you." *Id.* at 142.[3] Lastly, she testified that Smith had called her the night of the shooting and "said my dad

---

[3] According to the trial court's order on the Rule 404(b) issue, it seems Destiny could have testified that, during this most recent fight between Harmon and Morgan, along with threatening Harmon, Morgan physically harmed and hit her in the head with a bottle. However, such testimony was not elicited by the State.

just shot my mother." *Id.* at 143. Morgan briefly cross-examined Destiny. His questions focused on where her parents were living at the time of the shooting and confirmed that Destiny did not witness the shooting.

[15] The State then called Smith. He testified that while he sat with Morgan and Harmon in the car, Morgan had asked him to go somewhere with him and "wanted to ride with his stuff[,]"[4] but Smith refused to go with him. *Id.* at 153. Smith said that when he brought Morgan's gun out to him, he remained outside the car and told Morgan again that he was not going anywhere with him. He heard Harmon call Morgan "a bitch" and then saw Morgan put his head down. *Id.* at 154. Smith testified that when Morgan raised his head he said, "Move, Mike" and raised the gun. *Id.* When Smith did not move, Morgan said it again, and as Smith walked toward the house, he turned back to see that Morgan's "hand was up in the air, the gun went off, and [Harmon's] body flew into the pillar in the car." *Id.* It was then that Smith went inside and called Destiny and the police.

[16] Toward the end of trial, the defense called Morgan to testify. He claimed that he didn't recall threatening Harmon during the fight Destiny had described earlier. Morgan testified that on the day of the shooting, he and Harmon arrived at Smith's after an afternoon spent drinking in another part of town.

---

[4] The context of Smith's testimony indicates that the "stuff" Morgan was referring to was his gun. Smith was testifying about a conversation between him and Morgan during which Smith was "trying to take the gun and put it up" but Morgan insisted on having "his stuff." Tr. Vol. 2 at 153.

Smith came outside with the gun, got into the front seat, and put the gun down on the center console. He recounted how Smith moved to the back seat and Harmon returned to the passenger seat, and then Morgan claimed he had dozed off. When he woke up, Harmon was frustrated and wanted him to drive her somewhere. Then Harmon started moving around, and he believed she was reaching for the gun between them, so he reached for it as well. He felt Smith's gloved hand on the gun and claimed there was "a little scuffle" between him and Smith as both tried to get control of the gun. According to Morgan, the gun went off while both of them were still holding it. Tr. Vol. 3 at 43. When the gun went off, he "didn't hear [Harmon] talking no more [sic]." *Id.* at 44. He testified that he didn't know where Smith went after the shot was fired but confirmed that he remained in the car with Harmon until police arrived.

[17] Morgan proposed jury instructions for the lesser included offenses of reckless homicide and voluntary manslaughter, and the trial court gave both. The jury ultimately found Morgan guilty of murder.

### 4. Post-Trial

[18] After the verdict was read and the proceedings adjourned, the trial court spoke privately with the jurors about their experience and learned that Destiny's deposition had been inadvertently sent back with them during their deliberations. Later that same day, the trial court issued a notice informing the parties of the error. The court held a hearing a few days later, and Morgan moved for a mistrial, arguing the deposition was "unduly prejudicial" because it showed his "propensity for violence." *Id*. at 114. The State suggested the

parties needed "time to potentially further investigate the jurors[,]" and the court responded as follows:

> I'm not willing to have the jurors called to testify because in my reading of rules – of Evidence Rule 606, . . . I don't think it's necessary because I know that extraneous information was improperly brought to the juror[s'] attention. They all saw it. I know that for a fact because they told me. *And they all had a chance to review it*. So . . . I don't think there's anything to ask them about. . . . I would – will tell you based on my understanding of my conversations with them, *they considered it and they saw it*.

*Id.* at 115-16 (emphases added). The State then argued the error was harmless because most of the deposition's contents were already in evidence in some capacity and the remaining information was irrelevant to the disputed issues. Thus, the State claimed, "the impact that [the deposition] ha[d] on [the] jury's decision-making process [was] less when some of [that was] already into evidence." *Id.* at 117.

[19] The trial court took the matter under advisement and entered an order a week later denying Morgan's motion for a mistrial. The court reasoned that it did "not find that the prejudicial nature of the extrinsic material viewed by jurors, though inadmissible, could have had any impact on the verdict[.]" Appellant's App. Vol. 2 at 221.

[20] Morgan was sentenced to fifty-five years executed in the Department of Correction. After sentencing, he filed a motion to correct error asking the court

"to set aside [the] judgment of conviction and/or declare a mistrial."[5] Appellant's App. Vol. 3 at 10. The court denied the motion, and Morgan now appeals.

## Discussion and Decision

### 1. Standard of Review

[21] We review a trial court's denial of a motion to correct error for an abuse of discretion. *Coronado v. Coronado*, 243 N.E.3d 1121, 1124 (Ind. Ct. App. 2024); *see Becker v. State*, 992 N.E.2d 697, 700 (Ind. 2013). We will find an abuse of discretion "when the trial court's decision is against the logic and effect of the facts and circumstances before [it.]" *Coronado*, 243 N.E.3d at 1124 (quoting *Ind. Bureau of Motor Vehicles v. Watson*, 70 N.E.3d 380, 384 (Ind. Ct. App. 2017)). To review a motion to correct error, we must also review the underlying order. *Id.* Here, the underlying order was the trial court's denial of Morgan's motion for a mistrial.

> The decision to grant or deny a motion for a mistrial lies within the discretion of the trial court. *Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996)[, *reh'g denied*]. A mistrial is an extreme remedy granted only when no other method can rectify the situation. *Id.* On appeal, in order to succeed from the denial of a mistrial, the defendant must demonstrate that the conduct complained of was both error and had a probable persuasive

---

[5] Morgan filed a motion to correct error pursuant to Trial Rule 59, rather than under Criminal Rule 5.3. This was not addressed by the trial court, and neither party raised the issue on appeal.

effect on the jury's decision. *Jackson v. State*, 728 N.E.2d 147, 151 (Ind.2000); *Kelley v. State*, 555 N.E.2d 140, 141 (Ind.1990).

*Pierce v. State*, 761 N.E.2d 821, 825 (Ind. 2002).[6]

[22]   The State concedes that the jury's access to this extraneous evidence was error, so we focus on the issue of prejudice. Morgan asserts that Destiny's deposition influenced the jury's verdict because it "contained highly prejudicial information" about Morgan that the jury was not presented with at trial. Appellant's Brief at 19. He specifically cites the following information about Morgan contained in the deposition:

- He had "a record going back from abuse on [Harmon]." Ex. Vol. 1 at 160.
- He and Harmon had multiple fights over the last two years, including an older fight Destiny had not testified about at trial in which Morgan threatened to kill Harmon.

---

[6] Below, the parties presented arguments pursuant to a test articulated in *Hape v. State*, 903 N.E.2d 977, 987 (Ind. Ct. App. 2009), *trans. denied*. There, the appellant sought relief from the trial court's denial of his motion to poll the jury pursuant to Evidence Rule 606(b) about potentially extraneous information it considered. *Id.* Generally, jurors cannot testify to impeach a verdict. However, they may do so when extraneous prejudicial information was improperly brought to their attention, but only after the trial court applies a two-part burden-shifting test. *Id.* The defendant must prove the material was extrinsic, and if he does, the State must prove the error was harmless, *i.e.*, there was no substantial possibility that the information materially prejudiced the verdict. *Id.* If the State proves as much, "jurors may not impeach the verdict by testifying about it." *Id.* If it does not, the jurors may testify or submit affidavits to impeach the verdict. *Id.* at 987. Here, neither party sought to have a juror testify to impeach the verdict after the trial court assured them that the jurors saw and considered the deposition. The same is true on appeal—the parties apply the *Hape* test but do not seek relief from this court to allow juror testimony. Under such circumstances, that test would seem to be inapplicable. Nonetheless, because the standard of review for a motion for a mistrial is substantively similar to the *Hape* test, where the touchstone of both is prejudice, the parties' arguments on appeal can easily be applied to the appropriate standard discussed in *Pierce*.

- He had previously hit Harmon in the head with a bottle.

- He had beaten Harmon.

- He had driven while drunk multiple times.

- He had threatened to fight Destiny.

- He drank often and would play loud music that woke up the neighbors.

- He "always had [the gun] on him." *Id.* at 164.[7]

[23]     Morgan primarily focuses on the first piece of information listed above, claiming it "exposed [the jury] to evidence of [his] prior criminal record consisting of abuse and fights with Harmon going back years." Appellant's Br. at 20. He cites *Franklin v. State* to support his argument. 533 N.E.2d 1195 (Ind. 1989). There, the defendant was charged with and found guilty of murder. *Id.* at 1196. Our Supreme Court reversed his conviction and ordered a new trial because "a fingerprint record . . . [that] revealed [] [he] had been previously convicted and sentenced for a violation of the Indiana Controlled Substances

---

[7] The State asserts that most of this information is cumulative of other evidence admitted at trial. Specifically, it claims that Morgan and Harmon's history of fighting, Morgan's possession of a gun, and his drinking and driving are all facts that were admitted through other avenues. While we agree that evidence of Morgan's drinking and driving was cumulative, the remaining facts were not. The deposition included testimony about neighbors complaining about Morgan's loud music, drinking, and littering, information that was not presented at trial. Also, although Destiny testified at trial that Morgan and Harmon fought often and had a contentious relationship, that testimony did not portray a years-long history of physical violence or suggest that Morgan had a criminal record as a result of it. And as for the gun, Destiny stated in her deposition that Morgan "always had [the gun] on him" aside from a time prior to the shooting when she had taken it from him. Ex. Vol. 1 at 164. She said she eventually gave it back to him "due to him cussing [her] out, drinkin', [and] threatenin'" her and that after giving it back, she "didn't see it no more [sic] for a while." *Id.* However, the evidence presented at trial was that Morgan had only had the gun for a few weeks prior to the shooting. Thus, some of the prejudicial information in the deposition was not cumulative of other evidence at trial.

Act" was inadvertently sent back with the jury during deliberations. *Id.* The State argued that any error was harmless due to the overwhelming evidence to support the conviction. *Id.* The Court disagreed, reasoning:

> In the case at bar, the evidence against appellant was entirely circumstantial. There was testimony from two jail inmates that appellant had told them of his participation in the crime. Testimony of this nature is always suspect, but its credibility is left to the determination of the jury.

> In a situation of this sort where the jury is required to make their decision on circumstantial evidence and upon the testimony of fellow prisoners as to statements made by appellant while in confinement, it is essential that they not be unduly influenced by evidence which should have been excluded. There is little question that the jury was influenced by an instrument which should never have been presented to them. This "mishap" violated "the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." [*Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Osborne v. United States*, 351 F.2d 111 (8th Cir. 1965).]

> Under the circumstances, we cannot say that the submission of this evidence for the jury's consideration was harmless.

*Id.*

[24] Morgan also cites *Schlabach v. State*, in which a panel of this court, relying on *Franklin*, reversed and remanded a defendant's conviction and ordered a new trial. 842 N.E.2d 411, 420 (Ind. Ct. App. 2006), *trans. denied*. There, the defendant was convicted on two drug charges and sought reversal of his conviction because the jury had inadvertently been given a summons that

alleged the defendant had violated his probation in a separate case for drug possession. *Id.* at 413. The panel concluded that

> [t]he evidence against Schlabach, although perhaps stronger than that against Franklin, is nevertheless entirely circumstantial, and the summons was particularly prejudicial in that it revealed a prior conviction for marijuana possession. As such, "[t]here is little question that the jury was influenced by an instrument which should never have been presented to them." [*Franklin*, 533 N.E.2d at 1196]. We cannot conclude that the jury's consideration of the summons was harmless.

*Id.* at 416-17.

[25] The State contends that, in contrast to the evidence the jury inadvertently considered in *Franklin* and *Schlabach*, Destiny's deposition was devoid of any explicit indication of Morgan's criminal history or convictions. The State is correct—the deposition did not *explicitly* confirm that Morgan had a prior conviction. However, the jury could have reasonably interpreted Destiny's statement that Morgan had "*a record* going back *from* abuse" on Harmon as describing a *criminal* record, not merely a pattern of abuse. Ex. Vol. 1 at 160 (emphases added). We have no way of knowing how the jury interpreted that phrase and thus, we cannot definitively say that it was not privy to evidence of Morgan's criminal history. Moreover, there is no question that the deposition exposed the jury to Morgan's history of violence and threats against the same victim—whether charged and convicted for those acts or not. And while *Franklin* and *Schlabach* dealt specifically with inadvertent evidence of prior *convictions*, we see no reason—and the State offers no argument—why different

evidence of criminal activity could not be similarly prejudicial and thus necessitate a new trial.

[26] The State further distinguishes *Franklin* and *Schlabach* based on the fact that Morgan's case was not based solely on circumstantial evidence. Morgan acknowledges that the evidence in his case was not entirely circumstantial— Smith testified as an eyewitness. Even so, Morgan asserts, and indeed the State agrees, that because he testified in his own defense, "[t]his case comes down to witness credibility." Appellant's Br. at 20 (quoting Tr. Vol. 3 at 97 (the State's closing argument)); *see* Appellee's Br. at 12 ("[T]he only material issue in the case was whether Smith's or Morgan's story was more credible."). Given that credibility was at the heart of the case, Morgan argues the deposition necessarily undermined his credibility and thus prejudiced the jury's ultimate determination. We agree.

[27] Like Morgan, we acknowledge the distinctions between this case and *Franklin* and *Schlabach*—particularly, the presence of direct evidence. Morgan's case was not based on circumstantial evidence alone. However, neither *Franklin* nor *Schlabach* held that a jury's consideration of extraneous information is necessarily harmless when there is any direct evidence of the defendant's guilt produced at trial. They merely expressed that in the absence of direct evidence, it is essential that a jury's verdict is not unduly influenced by extraneous information. What's more, the direct evidence here was Smith's testimony which conflicted with Morgan's, thus requiring the jury to make inferences about Smith's and Morgan's credibility to determine which version of events to

believe.[8]  The jury is free to disbelieve or disregard any witness's testimony. *Ferrell v. State*, 746 N.E.2d 48, 51 (Ind. 2001) ("It is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve.").  Critically, the question of prejudice in this case is not whether there was sufficient evidence notwithstanding the erroneously considered extraneous information, but rather whether the error had a probable persuasive impact on the jury's decision.  The improperly considered evidence went directly to the credibility determination left to the jury—would it believe Morgan or would it believe Smith?  With its detailed descriptions of Morgan's violent history which he had no opportunity to refute, we cannot say with confidence that the deposition had no probable persuasive impact on the verdict.

[28]  The State argues "there was nothing in Destiny's deposition transcript that disparaged Morgan's truthfulness.  Rather, his credibility was undermined by the illogical nature of his own story[.]"  Appellee's Br. at 12.  However, the State ignores two important points.  First, while the deposition may not have directly implicated Morgan's truthfulness, it still implicated his character.  A defendant's credibility can be undermined in many ways, one of which is through evidence of their prior bad acts.  And indeed, our Rules of Evidence

---

[8] We note that the conviction in *Franklin* also turned on a credibility determination.  There, the State's evidence consisted of the "testimony from two jail inmates that [the defendant] had told them of his participation in the crime."  *Franklin*, 533 N.E.2d at 1196.  The court noted that "[t]estimony of this nature is always suspect, *but its credibility is left to the determination of the jury*."  *Id.* (emphasis added).

institute safeguards for the introduction of that kind of evidence. Evidence Rule 404(b) is designed to protect defendants from being convicted based on the mistakes of their past. *See Fairbanks v. State*, 119 N.E.3d 564, 565 (Ind. 2019) ("Rule 404(b)'s purpose is to prevent the jury from indulging in the 'forbidden inference'—that a defendant must be guilty of the charged crime because, on other occasions, he acted badly."), *cert. denied*; *see also Davis v. State*, 186 N.E.3d 1203, 1210 (Ind. Ct. App. 2022) ("[T]he purpose behind [] Rule 404(b) is to prevent[] the State from punishing people for their character[.]" (quoting *Laird v. State*, 103 N.E.3d 1171, 1177 (Ind. Ct. App. 2018), *trans. denied*) (internal quotations omitted), *trans. denied*. Thus, the Rule recognizes that a person's past actions, and especially their criminal history, impact how they are perceived and judged in the present. And when evidence of that past is improperly given to and considered by the jury—especially where the defendant had no opportunity to challenge it, cross-examine it, or counteract it—the goal of Rule 404(b) is lost.

[29] Such was the case here. Prior to trial, the court specifically excluded evidence of Morgan and Harmon's more distant past, finding it would be more prejudicial than probative under Evidence Rule 404(b) and 403. Nonetheless, this evidence of Morgan's past was ultimately presented to the jury, and he had no means by which to confront the allegations, offer contradictory evidence, or otherwise challenge the information. As Morgan's counsel pointed out at oral argument, the deposition was the only written testimony the jury possessed during its deliberations. The jurors had to rely on their memory to recall

testimony from the trial, but it had a printed deposition outlining Morgan's history of violence at its disposal, which it could review to the extent it chose as it deliberated. And because this error was only discovered after the verdict, there was no remedial measure available to minimize the prejudicial effect this information had on the jury's decision. Thus, while the deposition may not have cast doubt on the accuracy of Morgan's story, it certainly cast doubt on his character—and thus, his credibility.

[30] Additionally, the flip side of the coin was equally prejudicial. The deposition provided broader context and confirmation for the State's theory of the case, and it directly corroborated Smith's testimony. Destiny's statements filled in the background of Morgan and Harmon's tumultuous relationship, confirming that it wasn't just argumentative, but abusive. And Destiny explained that it had been going on for *years* and not just for the few weeks before the shooting. Thus, the deposition completed the picture and the story being told by the State at trial and likely clarified for the jury how this tragedy came to pass.

[31] And as for corroboration, Destiny stated in her deposition that after the incident, Smith called her and said that "[Morgan and Harmon] were arguin', and dad reached for the gun and said, 'Move, Mike.' And just shot her in the head." Ex. Vol. 1 at 164 . Although she testified at trial that Smith called her after the shooting and told her Morgan had shot Harmon, she did not explicitly recite what Smith told her that night or describe where he had been standing. *See* Tr. Vol. 2 at 143. No other evidence presented at trial corroborated Smith's testimony that Morgan specifically said, "Move, Mike." Ex. Vol. 1 at 164.

Morgan testified that at no point did he did tell Smith to move.  *See* Tr. Vol. 3 at 54.  And while this fact may seem inconsequential, after Morgan's testimony concluded, multiple jurors wrote questions asking whether he had told Smith to move during the incident.  Destiny's deposition thus corroborated a fact that jurors found important enough to inquire about during trial.

[32]     This case was unique in that there were no alternatives available to the court other than allowing a new trial because the jury had already deliberated and rendered a verdict.  This foreclosed the option to the court of admonishing the jury to reduce the prejudice caused by the deposition it was mistakenly provided.  And while the court could have permitted juror testimony to impeach the verdict, it explicitly told the parties that doing so was unnecessary, instead assuring them that the jury had both seen and considered the material.  Furthermore, before trial, the court excluded evidence about the more remote instances of Morgan's physical abuse and threats toward Harmon, finding that anything which occurred more than a few weeks before the shooting was more prejudicial than probative.  And yet, the court ultimately concluded that "the prejudicial nature of the extrinsic material . . . could [not] have had any impact on the verdict[.]"  Appellant's App. Vol. 2 at 221.  In light of the court's assurance regarding the jurors' actions and its earlier exclusion of most of the deposition evidence as prejudicial, and because this case undisputedly turned on the issue of credibility which was directly undermined by the contents of the deposition, it is unclear how the deposition would not have had a probable persuasive effect on the jury's verdict.  Therefore, we find the trial court's denial

of Morgan's motion for a new trial was an abuse of discretion as it was against the logic and effect of the facts and circumstances before it.

## Conclusion

[33] For the reasons set out above, we conclude the trial court abused its discretion in denying Morgan's motion for a mistrial, and therefore, his motion to correct error. As such, we reverse and remand with instructions for the court to hold a new trial.

[34] Reversed and remanded with instructions.

Foley, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Talisha Griffin
Matthew D. Anglemeyer
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Rebekah D. Bennett
Deputy Attorney General
Indianapolis, Indiana